**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SOUTHERN TRACK & PUMP, INC. a Florida Corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>TEREX    CORPORATION,    d/b/a    Terex Construction Americas,<br><br>                                    Defendant. | Case No:<br><br>State Court Case No:  08C-07-197 JEB<br><br>JURY TRIAL DEMANDED |

## <u>NOTICE OF REMOVAL</u>

Defendant, Terex Corporation d/b/a Terex Construction Americas, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, and D. Del. LR 81.1, hereby gives notice of the removal of this case and states as follows:

1.      This case was commenced in the Superior Court of Delaware in and for New Castle County and is now pending in that Court.  Process was served on Defendant on August 6, 2008.  A copy of Plaintiff's Complaint setting forth a claim for relief upon which the action is based is attached hereto and marked as Exhibit 1.  A copy of the summons issued for Defendant is attached hereto and marked as Exhibit 2.  A copy of the letter from Defendant's agent for service of process of the Complaint is attached hereto and marked as Exhibit 3.

2.      According to the Complaint, Plaintiff is a Florida corporation with its principal place of business in Florida.

3.      Defendant is a Delaware corporation with its principal place of business in Connecticut.

4.      This is a civil case over which the District Courts of the United States have original jurisdiction pursuant to 28 U.S.C. §1332.  The action is between citizens of different states and the amount in controversy exceeds the value of $75,000.00.  Attached hereto and marked as Exhibit 4 is a letter dated August 14, 2008, from counsel for Defendant to counsel for

Plaintiff, confirming that Plaintiff is seeking in excess of $75,000.00 exclusive of costs, fees, and interest.

5.    Copies of all process and pleadings served on the Defendant to date are attached hereto as Exhibits 1, 2, and 3, and a copy of the Civil Docket sheet is attached hereto as Exhibit 5.

Respectfully Submitted,

Dated:  August 26, 2008

/s/  AnnaMartina Tyreus
AnnaMartina Tyreus (DE Bar # 4771)
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue
15th Floor
Wilmington, DE 19801
(302) 252-4328 – tel.
(302) 661-7728 – fax

**Attorneys for Defendant – Terex Corporation d/b/a Terex Construction Americas.**

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2008, a copy of the above and foregoing Notice of Removal was mailed, postage prepaid, to:

Peter J. Walsh, Jr. and
Suzanne M. Hill
Potter, Anderson & Corroon, LLP
1313 North Market Street
Hercules Building, 6th Floor
Wilmington, DE  19899
(302) 984-6000
(302) 658-1192 (fax)

**Attorneys for the Plaintiff,
Southern Track & Pump, Inc.**

/s/ AnnaMartina Tyreus
AnnaMartina Tyreus

2

# EXHIBIT 1



EFiled: Jul 23 2008 3:36P
Transaction ID 20767180
Case No. 08C-07-197 JEB

**IN THE SUPERIOR COURT OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| Southern Track and Pump, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| Terex Corporation, d/b/a TEREX | ) | |
| CONSTRUCTION AMERICAS, | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT

Plaintiff Southern Truck and Pump, Inc. ("STP" or "Plaintiff") brings this complaint against Defendant Terex corporation, d/b/a TEREX CONSTRUCTION AMERICAS ("Terex").

### INTRODUCTION

1.    In this action, STP seeks: (i) a declaration that Terex, a manufacturer of construction equipment and parts ("Terex Products"), is obligated to repurchase from STP, formerly a distributor of Terex Products, certain inventory pursuant to 6 *Del. C.* §§ 2720, *et seq.*, and (ii) to recover monetary damages for Terex's failure to comply with its obligations, and for Terex's breach of the duty of good faith and fair dealing.

### PARTIES

2.    STP is a Florida corporation, with its principal place of business at 502 Highway 520, Cocoa FL.

3.    Terex is a Delaware corporation, having a place of business at 8800 Rostin Road, Southaven, Mississippi 38671. The division of Terex with which STP conducted business is TEREX CONSTRUCTION AMERICAS, which is the division responsible for conducting Terex's business within the United States and Canada.

## BACKGROUND

4.    In March 2007, STP and Terex entered into the Distributorship Agreement (the "Agreement"). A copy of the Agreement is attached hereto as Exhibit A. The Agreement provided for STP to become a distributor of Terex Products, as well as to provide services to customers purchasing or leasing Terex Products.

5.    In order to become a distributor of Terex Products, STP had to have capital available to make the minimum purchases required by § 3.1(a) of the Agreement, and cover all other expenses required. As a result, STP needed financing in order to start up its operation as a distributor of Terex Products.

6.    Terex assured STP that Terex would assist STP with obtaining favorable financing terms in order to induce STP to enter into the Agreement. Specifically, Terex promised STP that it would buy out the financing interest rate charged by GE to 1.85%, and arrange for a 60-month amortization period, rather than the 54-month amortization period as provided by the Inventory Financing Agreement with GE.

7.    Terex also led STP to believe that the financing that STP would obtain would be through Terex. In fact, Terex representatives described a "Terex dealer finance program" that would be made available to STP.

8.    In late March 2007, after receiving such assurances from Terex and entering into the Agreement, STP entered into an Inventory Financing Agreement with GE Commercial Distribution Finance Corporation ("GE") in reliance upon Terex's representations that it would assist STP with financing.

2

9. In connection with the Terex dealer financing program, STP used the capital obtained from GE to pay Terex in full for the Terex Products ordered to satisfy the initial inventory stocking order agreed to by Terex and STP.

10. In Fall 2007, STP complained to Terex regarding its failure to make the financing arrangements with GE that it had promised to STP. In response to STP's complaint, Terex acknowledged its original promise, but refused to honor that promise. Terex then promised to intercede on STP's behalf on terms that differed from its original promise. Terex never honored this promise either.

11. Beginning in February 2008, STP fell behind on payments due to GE; this was caused by the additional expense of the financing with GE that resulted from Terex's failure to follow through on its promise to assist STP with its financing.

12. STP corresponded with Terex representatives concerning its financing representations and was assured that a number of steps could be taken that would have the effect of providing STP with the equivalent of the original transaction terms discussed between Terex and STP, including, but not limited to, Terex taking back a portion of the inventory ("right sizing the inventory") and providing subsidies to GE that would have the effect of extending the amortization period for the loan, and buying down the interest rate closer to the rate originally promised to STP. STP relied on these discussions and representations by Terex personnel to continue interest payments to GE until April 2008.

13. On April 10, 2008, GE sent a notice of default and demand for cure letter to STP, and, on May 6, 2008, GE sent a notice of acceleration and termination letter to STP.

14. Throughout this time, STP continued to attempt to reach a resolution with Terex. Terex became less responsive. Finally, Terex changed its position once again and informed STP

3

that because Terex had been paid in full for the equipment and had no relationship with GE,
Terex would not intercede on STP's behalf. Terex then informed STP of its new position that
Terex had no obligation to provide any dealer assistance to STP in connection with the GE
financing.

15.     On or about May 20, 2008, after its initial attempts to negotiate a resolution with
Terex failed, STP sent notice of termination of the Agreement to Terex, effective May 21, 2008.
In its May 20th letter, STP informed Terex of its intent to return its inventory of Terex Products,
with the expectation that Terex would repurchase such inventory.

16.     On May 23, 2008, Terex responded to STP's termination letter, accepting the
termination, but refusing to repurchase STP's inventory, with the exception of $19,474.96 worth
of Terex Products.

17.     By letter dated June 2, 2008, STP demanded that Terex repurchase all of STP's
inventory pursuant to Delaware's statute regarding Equipment Dealer Contracts, 6 *Del. C.*
§§ 2720, *et seq.*

18.     On June 3, 2008, GE sent a forbearance agreement to STP, providing for GE to
forbear from foreclosing on STP's inventory until July 2, 2008, in exchange for STP continuing
to attempt to negotiate with Terex for the repurchase of its inventory, and STP making an
additional payment.

19.     On July 11, 2008, after the expiration of the forbearance period, GE sent a follow-
up letter to STP. GE demanded that STP voluntarily surrender its inventory of Terex Products to
GE, and remit payment of the entire outstanding balance due on STP's account by July 18, 2008.
GE expressed its intent to foreclose on STP's inventory if STP did not comply with its demands.
STP gave notice of this letter to Terex, and again demanded that Terex repurchase the inventory.

4

20.    On July 22, 2008, GE commenced seizure of STP's inventory of Terex Products.

21.    To date, Terex has refused to repurchase STP's entire inventory of Terex Products.

## COUNT I

### *Declaratory Judgment*

22.    STP incorporates by reference the allegations contained in paragraphs 1 through 21 as if they are fully set forth herein.

23.    By reason of the termination of the Agreement, Terex is required to repurchase STP's inventory pursuant to 6 *Del. C.* §§ 2720, *et seq.*

24.    Terex claims that it is not required to repurchase STP's inventory of Terex equipment and parts, and denies that 6 *Del. C.* §§ 2720, *et seq.* applies to the Agreement.

25.    An actual controversy exists with respect to the parties' rights and obligations.

26.    The parties' interests are real and adverse.

27.    The controversy that exists is ripe for judicial determination.

28.    STP is entitled to a declaration that 6 *Del. C.* §§ 2720, *et seq.* applies to the Agreement.

## COUNT II

### *Violation of 6 Del. C. §§ 2720, et seq.*

29.    STP incorporates by reference the allegations contained in paragraphs 1 through 28 as if they are fully set forth herein.

30.    The Agreement and the business relationship between STP and Terex is governed by 6 *Del. C.* §§ 2720, *et seq.*

31.    The Agreement was terminated effective May 21, 2008.

5

32.    Pursuant to 6 *Del. C.* § 2723(a), Terex was required to repurchase from STP, "all inventory previously purchased...that remains unsold on the date of the termination of the agreement" within 90 days of such termination.

33.    Terex has categorically denied any obligation or intention to repurchase STP's inventory. Instead, GE has commenced the seizure of STP's inventory and assets.

34.    Terex violated 6 *Del. C.* § 2723(a), and, therefore, STP is entitled to relief pursuant to 6 *Del. C.* § 2727(a).

## COUNT III

### *Breach of the Duty of Good Faith and Fair Dealing*

35.    STP incorporates by reference the allegations contained in paragraphs 1 through 34 as if they are fully set forth herein.

36.    Terex owes STP an implied duty of good faith and fair dealing with regard to its conduct pursuant to the Agreement.

37.    Terex promised STP that it would assist STP with regard to the financing it received in order to enter into the Agreement. STP entered into the financing agreement with GE in reliance upon these assurances from Terex.

38.    STP used the proceeds of the financing to pay Terex in full for its inventory of Terex Products, and expected to be able to, in turn, recover the cost of that inventory by selling or leasing Terex Products.

39.    Upon termination, the Agreement provides for STP immediately to take a number of actions, all for the purpose of removing its identification as a distributor of Terex's Products, and the Agreement requires STP to return documentary materials, records and supplies of Terex.

*See* Agreement, at §§ 8.2-8.3. Thus, STP is prevented from selling or leasing its remaining Terex Products after termination of the Agreement.

     40.     Terex has acted unreasonably and in bad faith, and deprived STP of the benefit of its bargain pursuant to the Agreement by failing to honor its promises with regard to STP's financing, which caused financial hardship for STP, keeping the proceeds of the sale of Terex Products to STP, and then failing to repurchase STP's inventory of Terex Products while depriving STP of the right to sell its inventory of Terex Products.

## PRAYER FOR RELIEF

     STP respectfully requests that this Court enter the following relief in favor of STP:

    a.   A declaration that 6 *Del. C.* §§ 2720, *et seq.* applies to the Agreement;

    b.   Damages in an amount equal to 100% of the current net price (as that term is used in 6 *Del. C.* § 2727(a)) of STP's inventory of Terex equipment and parts;

    c.   Damages in an amount equal to any freight costs (as that term is used in 10 *Del. C.* § 2727(a)) STP paid to transport the inventory from Terex's location to STP's location;

    d.   Damages in an amount equal to any costs arising out of GE's foreclosure on or seizure of STP's inventory of Terex Products, including but not limited to transportation costs and collection expenses;

    e.   Attorneys' fees, expenses, and Court costs;

    f.   Pre- and post-judgment interest; and

    g.   Any such other and further relief as the Court deems just.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _____

Peter J. Walsh, Jr. (#2437)
Suzanne M. Hill (#4414)
1313 N. Market St.
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Attorneys for Southern Track and Pump,
Inc.*

Dated:  July 23, 2008

874694

8

Exhibit A

Exhibit A

EFiled: Jul 23 2008 3:36PM EDT
Transaction ID 20767180
Case No. 08C-07-197 JEB

# EXHIBIT A

## DISTRIBUTORSHIP AGREEMENT (U.S.)

· This Agreement is entered into by and between Terex Corporation, d/b/a TEREX CONSTRUCTION AMERICAS ("Supplier"), a Delaware corporation having a place of business at 8800 Rostin Road, Southaven, Mississippi 38671; and Southern Track and Pump, LLC V ("Distributor"), a Limited Liability Company organized in the State of Louisiana, with its principal place of business at Cocoa Beach, FL.

In consideration of the mutual covenants contained herein, the parties agree as follows:

1.  **Products: Equipment; Parts**

    1.1     "**Equipment**" shall refer to those goods manufactured and/or marketed by Supplier and listed on **Schedule A** attached hereto, as such Schedule may be revised from time to time by Supplier, and all options, attachments and accessories to such goods.

    1.2     "**Parts**" shall refer to those goods manufactured and/or marketed by Supplier as replacement, repair, spare or service items for the Equipment and which are listed in the Parts Price List and supplements thereto furnished to Distributor from time to time by Supplier.

    1.3     "**Products**" shall refer to the Equipment and Parts together.

2.  **Appointment and Authority of Distributor**

    2.1     Subject to the terms and conditions of this Agreement, Supplier hereby appoints Distributor as a non-exclusive distributor of Supplier's Products in the Territory described in **Schedule A** attached hereto (the "Territory") during the initial term of this Agreement described in **Schedule A** attached hereto (the "Term"). Distributor hereby accepts said non-exclusive appointment, and agrees to use its best efforts to maximize sales and leases of the Products in its Territory. Distributor hereby accepts responsibility for stocking, display, sale, lease, delivery, installation, follow-up and service of Products in the Territory. Distributor acknowledges and agrees that Supplier is free to sell, rent, lease or otherwise convey Products within the Territory, and to appoint other distributors for the Products within the Territory, without incurring any liability or obligation to the Distributor, whether for a commission or otherwise.

    2.2     Subject to the terms and conditions of this Agreement, Distributor may sell Products purchased from Supplier in such manner, at such prices, and upon such terms, as Distributor shall determine. Distributor is an independent contractor, not an agent or employee of Supplier. Distributor is prohibited from, and shall not enter into, any contract or commitment in the name or on behalf of Supplier or bind Supplier in any respect whatsoever. Distributor is not authorized to assume or create any obligation or responsibility, including but not limited to obligations based on warranties (other than as specifically provided in Section 6.1 hereof) or guarantees or other contractual obligations, on behalf or in the name of Supplier. Distributor shall not misrepresent its status or authority.

    2.3     Effective as of the date hereof, Supplier hereby grants to Distributor a revocable, royalty-free, non-transferable, limited license to use the Supplier's marks or names specified as Trademarks in **Schedule A**, or such other marks or names as Supplier may from time to time specify (the "Trademarks"), to promote the sale and servicing of the Products within the Territory, solely in accordance with the following terms:

        (a)     Upon the prior written approval of Supplier, Distributor may utilize the Trademarks in Distributor's identifying materials (i.e., letterhead, business cards, signage), as well as in Distributor's advertising and promotional materials for the Products, and agrees to submit final proofs of all such identifying and promotional materials to Supplier for written approval prior to use.

        (b)     Notwithstanding such approval, Distributor agrees that all usage of the Trademarks shall strictly adhere to the usage guidelines established by Supplier from time to time.

        (c)     Distributor shall not include all or any portion of the Trademarks in its legally registered corporate name.

        (d)     Distributor shall at all times and in all printed materials clearly indicate that the Trademarks are registered trademarks of Supplier, and, to the extent practical, include the following attribution: "Terex is a registered trademark of Terex Corporation in the United States of America and many other countries, used with permission."

        (e)     Distributor agrees that it will utilize only materials that do not disparage or place in disrepute Supplier, its businesses or its business reputation, and do not adversely affect or detract from Supplier's goodwill or the goodwill appurtenant to the Trademarks or the Products and will use the Trademarks in ways which will not adversely affect Supplier's business reputation and goodwill.

(f)   The license granted hereunder will cease immediately upon (i) the termination of this Agreement; or (ii) the continued failure of Distributor to use the Trademarks in accordance with the terms hereof after ten (10) days written notice of same.

(g)   Upon the termination of the license granted hereunder, all signs, advertisements, identifying materials, promotional materials, and other literature and/or media containing Supplier's trade name or Trademarks which are in the Distributor's possession shall be immediately returned to Supplier or destroyed.

(h)   Distributor shall not (i) attack Supplier's title or right in and to the Trademarks in any jurisdiction, (ii) attack the validity of this license or the Trademarks or (iii) contest the fact that Distributor's rights under this Agreement cease upon termination of this Agreement. The provisions of this Section 2.3(h) shall survive the termination of this Agreement.

3.       **Responsibilities and Representations of Distributor.**

3.1       Distributor agrees to use its best efforts to develop fully the potential for sales, leases and use of Products in the Territory. To fulfill this responsibility, Distributor shall, without limitation:

(a)   Actively and vigorously promote the sale, lease and use of Products within the Territory to develop the market as fully as possible. This shall include, without limitation: (i) Distributor purchasing from Supplier during each applicable period during the term of this Agreement Products in at least the amount listed as the Minimum Purchases Amount in **Schedule A** attached hereto, or such other amount as evidenced from time to time in writing signed by Supplier and Distributor, (the "**Minimum Purchase Amount**"); and (ii) Distributor expending for advertising the Products during each applicable period during the term of this Agreement such amount as evidenced from time to time in writing signed by Supplier and Distributor. The Minimum Purchases Amount shall be measured using the aggregate value (ex-works price to the Distributor) of all Products and Parts purchased and paid for by the Distributor during the applicable period.

(b)   Maintain an organization and facilities (including without limitation suitable equipment and tools) in accordance with standards generally accepted in the industry, for the stocking, display, sale, lease, delivery, installation, follow-up and service of Products in accordance with standards generally accepted in the industry. **Schedule A** to this Agreement includes a list of the owners and managers of Distributor and others involved in the operation of Distributor. **Schedule B** to this Agreement sets out a full and complete description of the location or locations and premises at which Distributor is authorized to perform under this Agreement.

(c)   Employ adequately trained personnel in all functions, including competent salespeople and service mechanics, to provide prompt, courteous and workmanlike service, and to otherwise fulfill the Distributor's responsibilities under this Agreement. This shall include, without limitation, employing at all times during the term of this Agreement at least the number of qualified sales and service personnel employed by Distributor full-time and specified as the Minimum Staff in **Schedule A** attached hereto, or such other number as evidenced from time to time in writing signed by Supplier and Distributor (the "**Minimum Staff**").

(d)   Deliver and perform satisfactory service of Products in a prompt, courteous and professional manner, including delivery, installation, follow-up, warranty service and non-warranty service, with respect to all Products which are in the Territory, regardless of when, where or by whom sold or leased.

(e)   Maintain an inventory of Products reasonably sufficient to meet the anticipated short-term demand. Distributor will purchase all its requirements for Equipment directly from Supplier. Distributor shall furnish Supplier within 45 days after the close of its fiscal year and at such other times and as of such dates as may be reasonably specified by Supplier, reports as to Equipment and Parts on hand, sales activity and statements showing the financial condition and operating progress of Distributor.

(f)   Maintain a financial condition that is acceptable to Supplier to adequately support Distributor's business volume with Supplier, and maintain accurate records, financial statements and operating statements reflecting the condition of Distributor's business, in form satisfactory to Supplier, and provide to Supplier copies thereof not less frequently than annually. Without limiting the foregoing, Supplier may, in its judgment, request from time to time that (i) Distributor provide to Supplier interim financial statements, in form satisfactory to Supplier, and Distributor shall promptly provide such statements to Supplier; and (ii) Distributor allow Supplier's representatives, at reasonable times and from time to time, to examine Distributor's place of business, inventories and business records to confirm Distributor's compliance with its obligations to Supplier and to confirm Distributor's performance under this Agreement.

(g)   Cooperate with Supplier in any advertising, sales or promotion program, and comply with such policies and procedures relating to advertising sales or promotion as Supplier may adopt from time to time, and maintain a sufficient supply of current sales and service literature regarding the Products furnished by the Supplier.

(h)   Deliver Products only after they have been correctly assembled, adjusted and inspected and the purchaser or lessee, or anyone the purchaser or lessee designates, has been instructed as to the safe and proper operation of the Products, and submit to a purchaser or lessee at or prior to delivery of Products all pertinent information furnished by Supplier for delivery with the Products so purchased or leased, including any operator's or service manuals for the Products.

(i)    Notify Supplier immediately upon receiving notice of any claim, complaint or dispute being made against Distributor or Supplier by a customer or third party in respect of any of the Products, and comply with all instructions given by Supplier in relation to such claim, complaint or dispute and not make any admission, compromise or settlement of liability in relation to or acknowledge the validity of the same.

(j)    Meet such other reasonable standards and comply with such other policies and procedures as may be established by Supplier from time to time.

3.2    With each order for Products hereunder, Distributor represents and warrants, as of the date of purchase, that the Products are purchased for resale or lease in the ordinary course of Distributor's business, and that Distributor has complied with all pertinent provisions of local law relating to, and will pay, all sales, use and excise taxes and other charges imposed by any governmental authority applicable to such resale or lease transactions. Distributor shall provide to Supplier copies of all exemptions, certificates and similar documents relating to any such taxes and other charges. Distributor shall also pay all license fees, sales, use, personal property and excise taxes, duties and any other fees, assessments, liens or taxes that may be assessed or levied by any governmental authority against Supplier or Distributor on account of, or measured by, any Products that are in route to, shipped to or in the possession of Distributor, or any sale by Supplier to Distributor hereunder. Distributor agrees to indemnify and hold Supplier harmless from all of the above-described taxes, duties, fees, assessments and other charges.

3.3    Distributor shall maintain at all times this Agreement is in effect, with a reputable insurer satisfactory to Supplier and in an amount satisfactory to Supplier, comprehensive fire, casualty and liability insurance protecting the Distributor, the Products and the operations of Distributor under and pursuant to this Agreement, and protecting Supplier against any and all losses relating thereto by naming the Supplier as a co-insured or additional insured on such policy(ies). Distributor shall furnish certificates of such insurance to Supplier upon request. Such insurance policy(ies) shall provide that the insurer will notify Supplier not less than thirty (30) business days in advance of any change in coverage or cancellation.

3.4    Distributor acknowledges its responsibility under, and agrees to observe and comply at all times with, all applicable laws, rules, regulations, ordinances, standards and the like (including, without limitation, ANSI, OSHA and other safety standards) concerning the sale, use and operation of the Products, and avoid all deceptive, misleading, confusing or illegal business practices. Distributor shall follow, cooperate in, oversee and participate in any safety related campaigns mandated by Supplier and to take any action required by Supplier to actively participate in and carry out said Supplier required safety mandates and modifications related to the use and/or ownership of Products in accordance with instructions issued by the Supplier.

3.5    Distributor represents and warrants to Supplier that (a) the description of Distributor as a legal entity contained in the first paragraph of this agreement is accurate and not misleading; (b) Distributor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and is qualified to do business within the Territory; and (c) Distributor has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this Agreement.

4.    **Sales Procedure; Security Interest**

4.1    Prices to Distributor shall be those set forth in the Supplier's price list, as in effect from time to time, less any applicable distributor discount published by Supplier from time to time. Payment for Products shall be on such terms as shall be established by Supplier from time to time.

4.2    All Distributor orders shall be subject to confirmation by Supplier and shall be subject to Supplier's standard Terms and Conditions of Sale, as revised from time to time by Supplier, including without limitation those in effect on the date of this Agreement, as set forth in **Schedule C** attached hereto ("**Standard Terms and Conditions**"), and which shall constitute, along with this Agreement and any Security Agreement entered into between Distributor and Supplier, the entire agreement between the parties with respect to sales of Products; no additional or different terms set forth on Distributor's purchase order, acknowledgement or other forms or correspondence shall govern any sales of Products by Supplier to Distributor. Distributor shall comply with all such Standard Terms and Conditions; and any breach thereof shall also constitute a breach of this Agreement. No order for Products shall be binding on Supplier unless and until it is accepted and confirmed by Supplier in writing at its home office.

4.3    Supplier may refuse to accept any order from Distributor that Supplier determines in good faith to be detrimental to its best interests. Without limiting the foregoing, Supplier may refuse to ship Products to Distributor at any time if, in Supplier's opinion, Distributor's financial condition makes it imprudent to do so, or if Distributor has failed to perform its obligations under this Agreement. In such cases Supplier shall have the right, but not the obligation, to ship Products to the end user thereof and to bill the end user directly. Supplier shall not be liable for failure to ship Products on time or fill orders for Products where prevented by any cause beyond Supplier's reasonable control, or if the demand for any Products shall exceed Supplier's available supply. If Supplier does not have an adequate supply of Products for all orders from its distributors, Supplier may allocate Products among its distributors in any manner it deems appropriate.

4.4    Supplier may discontinue the manufacture of any Equipment or Part and make any changes and improvements at any time in the specifications, construction or design of Equipment or Parts without incurring any obligation to Distributor or customers of Distributor. Equipment and Parts so changed or improved will be accepted by Distributor in fulfillment of existing orders.

4.5   (a)   As security for the payment in full by Supplier to Distributor of the full purchase price for the Purchase Money Collateral (as hereinafter defined),and any other obligations of Distributor to Supplier related to the purchase price of said Purchase Money Collateral (the "PMSI Liabilities"), Distributor hereby grants to Supplier a purchase money security interest in the following property, wherever located, whether now owned or hereafter acquired, and all additions and accessions to and all cash and non cash proceeds of any of the following: all items of Distributor's inventory purchased from Supplier (including, without limitation, all such goods held for sale, lease or demonstration or to be furnished under contracts of service, and goods leased to others, and returned or repossessed goods originally purchased from Seller) and all related software either embedded or not embedded and all spare and repair parts, special tools and equipment for the foregoing (collectively, the "Purchase Money Collateral"). In addition to such foregoing security interest, and not in limitation thereof, in consideration of all Distributor's debts, obligations and liabilities to Supplier, however arising, whether previously, contemporaneously or hereafter made, incurred or created, and whether voluntary or involuntary (including without limitation any obligations arising under this Agreement or any sales agreement between Supplier and Distributor), Distributor hereby grants Supplier a continuing security interest in the Purchase Money Collateral, and all accounts, chattel paper and instruments arising out of Distributor's ownership or disposition of said Purchase Money Collateral, and all trade-ins therefore (collectively, the "Collateral").

(b)   Distributor hereby irrevocably authorizes Supplier to file financing statements under the Uniform Commercial Code to perfect and maintain the security interests granted by Distributor in this Agreement. At the request of Supplier, Distributor agrees to enter into additional agreements with Supplier to further document, perfect, or continue the grant by Distributor of the above security interests in favor of Supplier and to authorize and execute any further documents and filings that Supplier deems necessary in connection therewith. If Distributor fails to act as required by this Agreement, Supplier is authorized, in Distributor's name or otherwise, to take any such action, including, without limitation, signing Distributor's name or paying any amount required, and the cost shall be a liability secured under this Agreement and shall be payable by Supplier upon demand. Distributor grants Supplier a contractual right to set off any and all liabilities of Distributor secured hereunder, including without limitation, the PMSI Liabilities (collectively, the "Liabilities") against any credit balance of Distributor and against any other money now or hereafter owed to Distributor by Supplier. Distributor irrevocably appoints Supplier and any employee thereof, as Distributor's attorney, with full power to do all acts and things which Supplier may deem necessary to perfect, continue perfected, enforce or collect upon the security interests granted herein and to protect the Collateral, including, without limitation, the right and power, upon the occurrence of a default in payment, to endorse Distributor's name on any notes, checks or other proceeds of Collateral that may come into Supplier's possession and to execute proofs of claim and loss, and adjust and compromise claims under insurance policies. Supplier has no duty to protect, insure, collect or realize upon the Collateral or preserve rights in it against prior parties. Distributor agrees that Supplier may affix to any such financing statement or related filing a Collateral Description in substantially the form of Schedule D attached to this Agreement.

(c)   Distributor shall: maintain the Collateral in good condition and repair and not permit its value to be impaired; keep it free from all liens, encumbrances and security interests; defend the Collateral against all claims and legal proceedings by any persons; keep the Collateral and Supplier's interest in it insured under policies with such provisions, for such amounts and by such insurers as shall be satisfactory to Seller from time to time, and shall obtain endorsements naming Supplier as loss payee and furnish evidence of such insurance satisfactory to Seller; acquire all permits, licenses, and certificates of title required by law for it, its ownership, or its use or operation; pay and discharge when due all taxes, license fees, levies and other charges upon it, related to it, or related to its ownership, use of operation; not sell, lease or otherwise dispose of the Collateral or permit it to become a fixture or an accession to other goods, except for sales or leases of the Collateral in the ordinary course of Distributor's business; not permit the Collateral to be used in violation of any applicable law, regulation or policy of insurance; not make or permit any material changes to the Collateral; not move the Collateral to a location other than one of those listed at the end of this Agreement without Supplier's written consent.

(d)   Upon the occurrence of a default by Distributor under this Agreement or any other agreement between Distributor and Supplier, Supplier shall have the right to: (i) declare all amounts owing by Distributor to Supplier, at the option of Supplier and without notice or demand, immediately due and payable; (ii) exercise all rights and remedies for default provided by the Uniform Commercial Code, as well as by any other applicable law; and (iii) enter into premises where any of the Collateral may be located (including requiring Distributor to assemble the Collateral at a place designated by Supplier), and take possession of the Collateral. Distributor irrevocably appoints any employee of Supplier as Distributor's attorney, with full power to do all acts and things which Supplier may deem necessary to perfect, continue perfected, enforce or collect upon the security interests granted herein and to protect the Collateral, including, without limitation, the right and power, upon the occurrence of a default, to endorse Distributor's name on any notes, checks or other proceeds of collateral that may come into Supplier's possession and to execute proofs of claim and loss and adjust and compromise claims under insurance policies.

5.   **Promotional Activities; Confidentiality.**

5.1.   Supplier shall furnish to Distributor such promotional and descriptive literature concerning the Products, including catalogs and price lists, as Supplier furnishes to its distributors generally and as it may deem appropriate.

5.2.   In connection with this Agreement, Supplier has disclosed or may disclose to Distributor certain confidential and proprietary information and material (the "Information"), which may include, without limitation, customer, prospect and price lists, plans, photographs, designs, drawings, blueprints and specifications and other materials relating to the business of

Supplier. Distributor agrees that the Information provided to it, whether provided previously or after the date hereof, and whether in written, oral, encoded, graphic, magnetic, electronic or in any other tangible or intangible form, and whether or not labeled as confidential by Supplier or otherwise provided by Supplier hereunder, will be received and maintained in confidence by Distributor, and Distributor will not use, disclose, reproduce or dispose of such Information in any manner. Distributor agrees to use the Information solely for the purposes of fulfilling its obligations hereunder and agrees to restrict disclosure of the Information solely to its employees and agents who have a need to know such Information and to advise such persons of their obligations of confidentiality and non-disclosure hereunder. Distributor will not disclose the Information to third parties, including independent contractors or consultants, without the prior express written consent of Supplier and will advise such third parties of their obligations of confidentiality and non-disclosure hereunder. Distributor agrees to use reasonable means, not less than those used to protect its own similar proprietary information, to safeguard the Information.

5.3.     The obligation of confidentiality set forth in Section 5.2 will not apply with respect to any particular portion of the Information if such portion of the Information can be shown by Distributor to be (a) generally known to the public, other than as a result of the breach of Section 5.2 by the Distributor, at the time of Distributor's disclosure, or (b) in Distributor's possession, free of any obligation of confidence, from a source other than Supplier at the time of Distributor's disclosure.

5.4.     Distributor recognizes that its disclosure of Information will give rise to irreparable injury to Supplier, inadequately compensable in damages, and that accordingly, Supplier may seek and obtain injunctive relief against the breach of Section 5.2 in addition to any other legal remedies that may be available. Distributor's duty of confidentiality under Section 5.2 will survive the termination or expiration of this Agreement.

6.     Warranties, Limitations on Liability and Indemnification.

6.1     With respect to Products that are covered by Supplier's standard warranty or warranties, Distributor agrees to extend only the Supplier's standard manufacturer's limited warranty or warranties, as may be amended by Supplier from time to time, to its customers. Distributor is not authorized to and shall not extend to its customers on behalf of Supplier any other warranty with respect to Products. THE WARRANTY DESCRIBED IN THIS PARAGRAPH FOR DISTRIBUTOR'S CUSTOMERS SHALL BE SUPPLIER'S SOLE WARRANTY WITH RESPECT TO THE PRODUCTS; SUPPLIER PROVIDES NO WARRANTY (OTHER THAN TITLE) TO DISTRIBUTOR WHATSOEVER. PROVIDED, HOWEVER, IF THE DISTRIBUTOR IS THE END-USER, THE DISTRIBUTOR SHALL BE PROVIDED THE WARRANTY DESCRIBED IN THIS PARAGRAPH. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE, ARE HEREBY SPECIFICALLY DISCLAIMED AND EXCLUDED.

6.2     IN NO EVENT SHALL SUPPLIER BE LIABLE FOR, AND SUPPLIER HEREBY SPECIFICALLY DISCLAIMS, ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL AND CONTINGENT DAMAGES, INCLUDING WITHOUT LIMITATION, LOST PROFITS, LOST BUSINESS OPPORTUNITY, OR LOSS OF USE OF EQUIPMENT.

6.3     In the event Distributor extends any additional warranty or any other obligation whatsoever, Distributor shall be solely responsible therefor and shall have no recourse against Supplier. Distributor shall be responsible for any representations or statements that were not specifically authorized by Supplier. Distributor agrees to indemnify and hold Supplier harmless from any costs (including but not limited to reasonable attorney's fees), damages and liability resulting from a breach of this Section 6.

6.4     From and after the date hereof, and without limiting any other remedy available to Supplier, Distributor will indemnify and hold Supplier and its directors, officers, employees, agents, subsidiaries, parents and affiliates (each a "Supplier Protected Party") harmless from and against any and all claims, actions, suits, damages, losses, deficiencies, liabilities, obligations, commitments, costs or expenses of any kind or nature (including reasonable legal and other expenses incurred in investigating and defending against the same, and interest) incurred by such Supplier Protected Party resulting from (a) any breach of the representations, warranties, covenants, agreements and obligations of Distributor hereunder or (b) any negligent or willful acts or omissions of Distributor, its directors, officers, employees, agents, contractors, subsidiaries, parents, affiliates or those acting under any of them. The terms of this Section 6.4 will survive the termination or expiration of this Agreement.

7.     Term and Termination.

7.1     Unless sooner terminated as provided below, this Agreement shall continue in full force and effect for the Term set forth on Schedule A attached hereto, and thereafter shall be automatically renewed for successive one-year periods unless Supplier and Distributor agree in writing to a different term, or unless otherwise terminated as provided herein.

7.2     This Agreement may be terminated by either party without cause upon not less than 90 days written notice to the other party (or such longer notice as may be required by applicable law).

7.3     Either party to this Agreement may terminate this Agreement immediately and without notice or further action of any kind if the other party, or any guarantor or co-obligor of the obligations of Distributor to Supplier (under this Agreement or under any other agreement between Distributor and Supplier), becomes insolvent or the subject of any state or federal bankruptcy, insolvency

or similar proceedings; makes an assignment for the benefit of creditors; becomes unable to pay its debts as they become due; goes into liquidation or winding-up; commences or has commenced with respect to it any dissolution proceedings; or if a receiver is appointed for a substantial part of the assets of such party or such guarantor or co-obligor; or if there is any levy, attachment or similar action that is not vacated or removed by payment or bonding within 10 days.

7.4    This Agreement may be terminated by Supplier at any time effective upon giving notice to Distributor, in the event:

(a)    Any Products that are subject to a security interest in favor of Supplier or any other party are sold out of trust or Distributor makes any fraudulent transfer of any of its assets;

(b)    Distributor submits to Supplier any false or fraudulent statement, application or claim or financial information, or other information relating to the Products, Distributor's sales thereof, or warranty service related to Products; or Distributor or any general manager or proprietor of Distributor, or any of its officers or directors, or any general partner or any person named herein as a principal of Distributor makes or shall have made, in connection with its application to be a Distributor of Supplier, any material misrepresentation or omission;

(c)    Distributor fails to continue to operate its business as customarily operated or Distributor abandons its business;

(d)    Distributor, or the proprietor or general manager of Distributor, or any of its officers or directors, or any general partner or any person named herein as a principal of Distributor, is convicted of any violation of law if, in Supplier's opinion, such conviction would adversely effect the business or reputation of Supplier, other authorized distributors of Supplier, or any Products, or the marketing and sale of the Products;

(e)    There is any change, whether direct or indirect, voluntary or involuntary, in the ownership or control of Distributor, or any owner, manager or other person required to be actively engaged in the management of Distributor as set forth on Schedule A attached hereto cease to be involved in the business of Distributor; or Distributor fails to continue its business as customarily operated or Distributor abandons its business;

7.5    This Agreement may be terminated by Supplier effective upon not less than 30 days' notice to Distributor, in the event:

(a)    Distributor breaches or fails to perform its obligations hereunder, including failing to satisfy the Minimum Purchase Amount, minimum advertising expenditure or Minimum Staff requirements set out herein; or Distributor fails to pay any indebtedness to Supplier when due; or Distributor otherwise breaches or fails to perform its obligations under any other agreement between Distributor and Supplier, and such failure is not cured or corrected as required therein;

(b)    Any licenses, permits or authorizations necessary to conduct Distributor's business in accordance with the terms hereof are not obtained or maintained, or are cancelled, revoked or suspended; or

(c)    There is any transfer or attempted transfer by Distributor of its rights, or any part thereof, under this Agreement, without Supplier's prior written consent.

7.6    Any act or omission of any affiliate of Distributor, which if committed or omitted by Distributor would have been a breach of this Agreement by Distributor, will be deemed to be a breach of this Agreement by Distributor, and Distributor will be liable to Supplier accordingly.

8.    Effect of and Obligations of the Parties
in the Event of Expiration or Termination.

8.1    In the event of expiration or termination of this Agreement for any reason, all indebtedness of Distributor to Supplier shall become immediately due and payable. Termination or expiration of this Agreement will not affect any liabilities or obligations, including without limitation payment and indemnification obligations, which arose pursuant to the terms of this Agreement, or which involve events occurring, prior to the date of termination or expiration.

8.2    In the event of termination of this Agreement for any reason, Distributor will immediately cease to use any documents identifying it as a distributor or dealer for Supplier, and will promptly remove all signs, cancel all business listings, and take such reasonable actions as may be necessary to remove its identification as a distributor of the Products of Supplier.

8.3    Upon the effective date of any expiration or termination of this Agreement, Distributor will return, at its cost and expense, all records, books, customer, prospect or price lists, drawings, blueprints, instruction sheets, service parts cross-reference materials, machine records, sales and service records, advertising and promotional materials and all of Supplier's supplies of every kind and character, and all other documents relating to the business of Supplier which may be in the possession or under the control of Distributor.

9.      **Foreign Corrupt Practices Act, Third Party Payments and Export Controls**

9.1     The U.S. Foreign Corrupt Practices Act (the "Act") as applied to Supplier makes it unlawful, among other things, for a U.S. company or anyone acting on its behalf to make or offer a payment, promise to pay, or authorize the payment of anything of value to: (a) any officer or employee of, or any person acting in an official capacity for a non-U.S. government (hereafter referred to as a "foreign government") or any department, agency, instrumentality or corporation thereof or controlled thereby, or any foreign political party, party official or candidate for any such foreign government or political party office, or (b) any person, while knowing or having reason to know that all or a portion thereof will be offered, given or promised, directly or indirectly, to anyone described in (a) above, for the purpose of: (i) influencing any act or decision by such person in his or her official capacity, or (ii) inducing him or her to use his or her influence with a foreign government to affect, either by action or inaction, any act or decision of such government to obtain or retain business for any person for the benefit of Supplier. Distributor acknowledges receipt of a copy of the Act, confirms its understanding of the provisions of the Act, and agrees to comply with those provisions and to take no action that might cause Supplier to be in violation of the Act.

9.2     Distributor affirms that no government official has any ownership interest, direct or indirect, in Distributor or in the contractual relationship established by this Agreement. In the event that during the term of this Agreement a foreign government official acquires an interest in Distributor or in the transaction contemplated by this Agreement, Distributor agrees to make immediate disclosure to Supplier. Upon such an event, this Agreement will become subject to immediate termination by Supplier. For the purpose of this Section, "government official" means any officer or employee of a foreign government or any department, agency, instrumentality or corporation thereof or controlled thereby, or of any political party, party official or candidate for any such foreign government or political party office, as well as any immediate family members or nominees of such official or candidate.

9.3     Distributor hereby affirms that it will obtain and provide copies to Supplier of written assurances in the form of the preceding two paragraphs above from any sub-agent, sub-distributor, consultant or other party, retained by or paid by Distributor in connection with the sale or distribution of the Products, that they will comply with the Act and will take no action that might cause Supplier to be in violation of the Act.

9.4     In the event Supplier notifies Distributor that Supplier has information or belief that there may be or may have been a violation of the terms of this Section 9 by Distributor or by any sub-agent, sub-distributor, consultant or other party, retained by or paid by Distributor in connection with the sale or distribution of the Products, Distributor agrees to cooperate with Supplier to investigate the possible violation and to grant Supplier the right to audit Distributor's books, records and other relevant documentation. Failure to cooperate fully shall be deemed grounds for immediate termination of this Agreement by Supplier.

9.5     Distributor affirms that it has not and agrees that it will not, in connection with the transactions contemplated by this Agreement or in connection with any other business transactions involving Supplier make or promise to make any payment or transfer anything of value, directly or indirectly (i) to any government official or employee (including employees of government owned or controlled corporations); (ii) to any political party, official of a political party or candidate for any such foreign government or political party office; (vii) to any officer, director, employee, or representative of any actual or potential customer of Supplier; (iv) to any officer, director or employee of Terex Corporation or any of its affiliates, (or to an intermediary for payment to any of the foregoing); or (v) to any other person or entity if such payment or transfer would violate the laws of the country in which made or the laws of the United States. It is the intent of the parties that no payments or transfers of value shall be made which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining or retaining business. This Section shall not, however, prohibit normal and customary business entertainment or the giving of business mementos of nominal value.

9.6     Distributor represents, warrants and covenants that it shall comply with all applicable laws and regulations which control the export or re-export of commercial goods, technology and software which are obtained from Supplier pursuant to this Agreement. Specifically, Distributor represents, warrants and covenants that it shall, and any sub-agent, sub-distributor, consultant or other party, retained by or paid by Distributor in connection with the sale or distribution of the Products shall, (i) comply with the U.S. Export Administration Act, as amended (50 U.S.C. 2401 et seq.) and the U.S. Export Administration Regulations, as amended (15 CFR, Chapter VII, Subchapter C), including without limitation all applicable United States embargoes and sanctions relating to the Products, and (ii) comply with all applicable U.S. sanctions with respect to those individuals and entities whose names appear on the Specially Designated Nationals List, the Entity List, the Denied Persons List or the Unverified List. Distributor further represents, warrants and covenants that it shall not, and any sub-agent, sub-distributor, consultant or other party, retained by or paid by Distributor in connection with the sale or distribution of the Products shall not, export or re-export the Products, directly, or with its knowledge, indirectly, to any country for which the United States government (or agency thereof) may require an export license or other approval or any country, person or entity to which such export or re-export may be prohibited by applicable United States law, regulation, policy or executive order. Failure to comply strictly with all applicable laws relating to embargoes, sanctions, export or re-export shall be grounds for immediate termination of this Agreement by Supplier.

10.    Miscellaneous

10.1    This Agreement, together with the standard Terms and Conditions, the Security Agreement and the schedules and attachments hereto and thereto, constitutes the entire agreement between Distributor and Supplier, superseding all prior oral or written agreements, policies or understandings, on the subject of the continuing relationship between Distributor and Supplier and, except as otherwise provided herein, may be amended only by a writing signed by both parties hereto. No failure of Supplier to insist upon strict compliance with any provision of this Agreement shall constitute waiver thereof for the future, and all provisions herein shall remain in full force and effect. The construction and interpretation of this Agreement will not be strictly construed against the drafter.

10.2    This Agreement and any purchase and sale transaction arising pursuant hereto shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to the conflicts of laws principles thereof, and the parties hereby agree to submit any disputes arising under this Agreement to the exclusive jurisdiction of federal or state courts within New Castle County, Delaware, and to submit to the personal jurisdiction of such courts for any such disputes.

10.3    If any portion of this Agreement shall be invalid or unenforceable or shall violate any law of the United States or of any state or other jurisdictions in which Distributor is to perform this Agreement or in which this Agreement is sought to be enforced, then such provisions shall be enforced to the maximum extent permitted by law, and such validity or unenforceability shall neither invalidate their effect elsewhere nor affect the validity or enforceability of the other provisions of this Agreement.

10.4    Distributor and Supplier acknowledge that the Products are not "Motor Vehicles," "Farm Equipment," "Utility Equipment" or "Industrial Equipment" and neither party regards them as such. It is the parties' intent and agreement that the Motor Vehicles, Farm Equipment, Utility Equipment or Industrial Equipment dealer or franchise laws of any state, insofar as they might otherwise be deemed to apply to this Agreement and the relationship between Supplier and Distributor, shall not apply or be deemed applicable to this Agreement or the relationship created by this Agreement.

10.5    Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, telegraphed, telexed, sent by facsimile transmission (provided acknowledgment or receipt thereof is delivered to the sender), sent by certified, registered mail or overnight mail. Any such notice shall be deemed given when so delivered personally, telegraphed, telexed or sent by facsimile transmission or, if mailed by certified, registered mail, five (5) business days after the date of deposit in the United States mail, or, if mailed by overnight mail, one (1) business day after the date of deposit with an overnight mail service. Each such notice shall be sent to the address of the party set forth in this Agreement or such other address as shall have been specified by notice hereunder.

10.6    Distributor acknowledges that Supplier is relying on Distributor's skill and expertise to perform its obligations under this Agreement, and on certain representations from Distributor concerning the ownership of Distributor and the skill of its principals and key employees, and that this Agreement is in the nature of a personal services contract. Therefore, this Agreement may not be assigned by Distributor, whether voluntarily or by operation of law, without the consent of Supplier. This Agreement, or any of Supplier's rights hereunder, may be assigned by Supplier upon notice to Distributor.

10.7    Except as otherwise specified in this Agreement, Supplier shall have no liability for any expenditure made, or loss of income incurred, by the Distributor in preparation for performance or in the performance of the Distributor's obligations under this Agreement. Neither Supplier nor Distributor shall by reason of the termination, expiration or non-renewal of this Agreement be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, investments, leases, property improvements or commitments in connection with business or goodwill of the Supplier, or the Distributor, or otherwise.

10.8    In the event Supplier sells Products to Distributor after termination or expiration of this Agreement, or accepts any order for Products from Distributor, such sales or acceptance shall not be construed as a renewal of this Agreement nor as a waiver of such termination or expiration unless Supplier shall have specifically so stated in writing, but shall in all other respects be deemed to be in accordance with the terms of this Agreement. While this Agreement is in effect or following its termination or expiration, Supplier may apply any amount which it or its divisions, subsidiaries or affiliates owes Distributor to any obligations of Distributor to Supplier or to any division, subsidiary or affiliate thereof.

[Remainder of Page Blank -- Signatures on Next Page]

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates written below.

Date:  3/12/07

DISTRIBUTOR:

Southern Track and Pump, LLC  inc

By:
Name: Joe Thurston
Title: President

Attest:
Name: Dave Thurston
Title: V.P

Date: _____

SUPPLIER:
TEREX CORPORATION d/b/a
TEREX CONSTRUCTION AMERICAS

Attest: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

Page 9 of 15

SCHEDULE A

Commencement Date :

Term: one (1) year, commencing on the Commencement Date

| Equipment: | Name or Brand | Model Number or Category |
|---|---|---|
| | Terex Construction America: | Terex Light Construction |
| | | Terex Heavy Construction |
| | | Terex Articulated Trucks |

Minimum Advertising Expenditure : $10,000.00

Distributor must submit to the Supplier a marketing plan no less than sixty (60) days prior to the expiration of the then-current term or renewal term.

Equipment
Minimum Purchases Amount

| | Year 1 (2007) | Year 2 ___(2008)___ (If applicable) |
|---|---|---|
| Brand: Terex<br>Model: Mini Excavators | Quarter 1: (7)<br>Quarter 2: (8)<br>Quarter 3: (7)<br>Quarter 4: (8) | Quarter 1: (7)<br>Quarter 2: (8)<br>Quarter 3: (7)<br>Quarter 4: (8) |
| Brand: Terex<br>Model: Crawler Excavator | Quarter 1: (4)<br>Quarter 2: (4)<br>Quarter 3: (4)<br>Quarter 4: (3) | Quarter 1: (4)<br>Quarter 2: (4)<br>Quarter 3: (4)<br>Quarter 4: (4) |
| Brand Terex<br>Model: Compact Wheel Loader | Quarter 1: (2)<br>Quarter 2: (1)<br>Quarter 3: (1)<br>Quarter 4: (1) | Quarter 1: (2)<br>Quarter 2: (2)<br>Quarter 3: (2)<br>Quarter 4: (2) |
| Brand: Terex<br>Model: Heavy Wheel Loader | Quarter 1: (2)<br>Quarter 2: (3)<br>Quarter 3: (2)<br>Quarter 4: (3) | Quarter 1: (3)<br>Quarter 2: (3)<br>Quarter 3: (3)<br>Quarter 4: (3) |
| Brand: Terex<br>Model: Articulated Trucks | Quarter 1: (2)<br>Quarter 2: (1)<br>Quarter 3: (2)<br>Quarter 4: (1) | Quarter 1: (2)<br>Quarter 2: (2)<br>Quarter 3: (2)<br>Quarter 4: (2) |
| Brand: Terex<br>Model: Loader Backhoe | Quarter 1: (3)<br>Quarter 2: (3)<br>Quarter 3: (3)<br>Quarter 4: (3) | Quarter 1: (4)<br>Quarter 2: (5)<br>Quarter 3: (5)<br>Quarter 4: (4) |

If this Agreement is renewed or otherwise continued following the expiration of the Term, then the total annual Minimum Purchases Amount of Equipment for Year three and any subsequent year shall be agreed by the parties in writing at the end of Year two or any such subsequent year, as the case may be; provided however, that in no event shall the annual Minimum Purchases Amount of Equipment for Year three and any subsequent year shall be less than 110% of the total annual Minimum Purchases Amount for the prior year.

**Parts**

Minimum Purchases Amount

| | Year 1    (2007) | Year 2    (2008) |
|---|---|---|
| Brand: Terex<br>Model: Mini Excavator | (2)% of total Equipment purchases per quarter | (2)% of total Equipment purchases per quarter |
| Brand: Terex<br>Model: Crawler Excavator | (2)% of total Equipment purchases per quarter | (2)% of total Equipment purchases per quarter |
| Brand: Terex<br>Model: Compact Wheel Loader | (2)% of total Equipment purchases per quarter | (2)% of total Equipment purchases per quarter |
| Brand: Terex<br>Model: Heavy Wheel Loader | (2)% of total Equipment purchases per quarter | (2)% of total Equipment purchases per quarter |
| Brand: Terex<br>Model: Articulated Trucks | (2)% of total Equipment purchases per quarter | (2)% of total Equipment purchases per quarter |
| Brand: Terex<br>Model: Loader Backhoe | (2)% of total Equipment purchases per quarter | (2)% of total Equipment purchases per quarter |

If this Agreement is renewed or otherwise continued following the expiration of the Term, then the total annual Minimum Purchases Amount of Parts for Year three and any subsequent year shall be agreed by the parties in writing at the end of Year two or any such subsequent year, as the case may be; provided however that in no event shall the annual Minimum Purchases Amount of Parts for Year three and any subsequent year be less than 110% of the total annual Minimum Purchases Amount for the prior year.

Notice Period : 90 Days

Territory: St. Lucie, Indian River, Brevard, Osceola, Volusia Counties in Florida , *orange, west Palm, martin*

Trademarks: TEREX and any and all related machine names, numbers and logos.

Minimum Staff: - 8 - full-time sales people          _____ part-time sales people

          - 8 - full-time service people          _____ part-time service people

Signatures:

For Supplier:    _____

For Distributor:   _____

SCHEDULE "B: STATEMENT OF DISTRIBUTOR LOCATIONS AND PREMISES

For purposes of the current Distributorship Agreement, effective as of ___March 1___, 2007, between the undersigned Distributor and Supplier, Distributor and Supplier hereby agree that the following describes the location or locations and premises at which Distributor, as of ___March 1___, 2007 is authorized to conduct Supplier distributorship operations. Distributor also represents that the terms under which it occupies the premises are accurately reflected below as follows:

A.     LOCATION AND OWNERSHIP OF PREMISES

*under Construction*

| Location | Street Address, City & State | Indicate by (X) | | Name of Lessor |
|---|---|---|---|---|
| | | Owned | Leased | |
| Principal | 520 Cocoa FL 32926 ✓ | ✓ | | |
| Branch 1 | 2200 U Kings highway ft. pierce | ✓ | | |
| Branch 2 | 720 Cideo Rd. cocoa FL. 32926 | | ✓ | Jon Dyer |
| Branch 3 | | | | |

B.     DESCRIPTION OF PREMISES LISTED IN "A" ABOVE AND PURPOSES FOR WHICH USED BY DEALER

| Location | Purposes for which used – Indicate by (X) | | | | Land Acres | Bldg Sq. Ft. |
|---|---|---|---|---|---|---|
| | New Equip Sales | Used Equip Sales | Service Repair | Parts Sales | | |
| Principal | ✓ | ✓ | ✓ | ✓ | 3.8 | 12,000 |
| Branch 1 | ✓ | ✓ | ✓ | ✓ | 1.6 | 6,000 |
| Branch 2 | ✓ | ✓ | ✓ | ✓ | 4.0 | 5,500 |
| Branch 3 | ✓ | ✓ | ✓ | ✓ | | |

*Rental RPO's* ✓

C.     LEASED PREMISES: PROVIDE INFORMATION ON PREMISES DESIGNATED AS LEASED IN "A" ABOVE

| Location | Term of Lease | | Annual Rental | Term of Renewal Option |
|---|---|---|---|---|
| | From | To | $ | |
| Principal | | | $ | |
| Branch 1 | | | $ | |
| Branch 2 | march 1st 2007 | march 1st 2008 | $ 3,500 | open |
| Branch 3 | | | $ | |
| Branch 4 | | | $ | |

*leased till New facility is built*

<u>SCHEDULE C - TEREX CONSTRUCTION AMERICAS STANDARD TERMS AND CONDITIONS OF SALE</u>

1. **Terms and Conditions.** These Terms and Conditions of Sale cancel and supersede any and all terms of sale pertaining to Parts and Equipment (and any supplements thereto) previously issued by Seller to Buyer and are subject to change without advance notice. The prices, charges, discounts, terms of sale and other provisions referred to or contained herein shall apply to Parts and Equipment (collectively, "Products") sold and shipped to Buyer on and after January 1, 2006, and shall remain in effect unless and until superseded in writing by Seller. "Equipment" shall refer to those goods manufactured and or marketed by Seller and listed on the accompanying sales order, and all options, attachments and accessories to such goods. "Parts" shall refer to those goods manufactured and or marketed by Seller as replacement, repair, spare or service items for the Equipment. Acceptance of an order for Equipment and/or Parts by Seller shall be deemed to constitute a binding agreement between the parties pursuant to the terms and conditions contained herein and Buyer agrees that the order may not thereafter be cancelled, countermanded or otherwise changed without the prior written consent of Seller. This agreement supersedes any prior agreements, representations, or other communications between the parties relating to the subject matter set forth herein. No other terms and conditions shall apply including the terms of any purchase order submitted to Seller by Buyer, whether or not such terms are inconsistent or conflict with or are in addition to the terms and conditions set forth herein. Seller's acceptance of Buyer's purchase order is conditional upon Buyer's acceptance of all the terms and conditions contained herein. Any communication construed as an offer by Seller and acceptance thereof is expressly limited to the terms and conditions set forth herein.

2. **Terms of Payment.** Payment for Parts and Equipment purchased by Buyer shall be made in accordance with any of the following terms, provided they have been previously arranged with and expressly approved by Seller in writing: (1) cash in advance; (2) confirmed, irrevocable letter of credit established in such amount and form and at such time and at such bank as shall be approved by Seller in respect of each order; (3) credit account purchases for which payment will be due and payable on net thirty (30) day terms, plus service and other charges applicable to past due amounts in accordance with Seller's written notice; or (4) other payment arrangements expressly approved by Seller in writing prior to or at the time the order is placed. If any Buyer credit account purchase is not paid in accordance with Seller's credit payment terms, in addition to any other remedies allowed in equity or by law, Seller may refuse to make further shipments without advance payment by Buyer. Nothing contained herein shall be construed as requiring Seller to sell any Parts or Equipment to Buyer on credit terms at any time, or prohibiting Seller from making any and all credit decisions which it, in its sole discretion, deems appropriate for Seller. Seller shall charge interest on all amounts not paid when due and Buyer agrees to pay such interest calculated on a daily basis, from the date that payment was due until the date that Seller receives payment in full, at the rate of 1.5% per month or the maximum interest rate permitted by applicable law. Unless otherwise agreed in writing between Seller and Buyer, Seller may, in its sole discretion, increase or decrease the price of any Parts or Equipment, as Seller deems reasonably necessary, at any time prior to shipment and invoice Buyer for the same. The purchase price of Parts and Equipment is in effect at the time an order is placed may not be the same price in effect at the time of shipment. Buyer shall be invoiced for, and agrees to pay, the price in effect at the time of shipment.

3. **Taxes and Duties.** Unless otherwise noted, prices quoted do not include taxes or duties of any kind or nature. Buyer agrees that it will be responsible for filing all tax returns and paying applicable tax, duty, export preparation charge and export documentation charge resulting from the purchase of the Products. In addition, in the event any other similar tax is determined to apply to Buyer's purchase of the Products from Seller, Buyer agrees to indemnify and hold Seller harmless from and against any and all such other similar taxes, duties and fees. All prices quoted are U.S. DOLLARS unless otherwise specified. The amount of any present or future taxes applicable to the sale, transfer, lease or use of the Products shall be paid by Buyer; or in lieu thereof, Buyer shall provide Seller with a tax exemption certificate satisfactory to the applicable taxing authority proving that no such tax is due and payable upon such sale, transfer, lease or use.

4. **Titles, Transportation and Delivery.** Unless otherwise stated in writing, for all intra-continental United States shipments, all prices are F.O.B. point of manufacture; for all other shipments, all prices are FAS. Title and all risk of loss shall be born by Buyer upon delivery by Seller at place of shipment. Any claims for loss, damage or delay in transit must be entered and prosecuted by the Buyer directly with the carrier, who is hereby declared to be the agent of the Buyer. Seller shall not be liable for any delay in performance of this agreement or delivery of any Products, or for any damages suffered by Buyer by reason of delay, when the delay is caused, directly or indirectly, by fire, flood, accident, riot, acts of God, war, governmental interference, strikes, embargoes, labor difficulties, shortage of labor, fuel, power, materials or supplies, transportation, or any other causes beyond Seller's control. In the event delay is caused by Buyer's failure to furnish necessary information with respect to data and details for Buyer's specifications, Seller, may extend the date of shipment for a reasonable time, but in no event longer than five (5) days. In the event delay in shipment is caused by Buyer or at Buyer's request, and the Products are not shipped within five (5) days from the first date they are ready to be shipped, Seller may, in its sole discretion, sell such Products to another buyer without any liability or responsibility to Buyer whatsoever. All payments shall be made in accordance with the terms of the applicable invoice. In addition, storage charges due to delay in furnishing delivery instructions, arranging and establishing a method of payment satisfactory to Seller, or submitting valid import permits or licenses, or any other delay caused by Buyer or at Buyer's request, will be for the account of Buyer. **THE SELLER SHALL NOT BE LIABLE FOR ANY LOSS OF USE OR FOR ANY OTHER INDIRECT, CONSEQUENTIAL, INCIDENTAL OR OTHER DAMAGES OR LOSSES DUE TO DELAY IN SCHEDULED DELIVERY.** Claims for shortages in shipments shall be deemed waived and released by Buyer unless made in writing within five (5) days after Buyer's receipt of shipment. Seller's responsibility for shipment shall cease upon delivery of the Products to the place of shipment, and all claims occurring thereafter shall be made to or against the carrier by Buyer.

5. **Cancellation.** Prior to delivery to place of shipment, an Equipment or Parts order may be cancelled only with Seller's prior written consent and upon terms indemnifying Seller from all resulting losses and damages. Seller shall have the right to cancel and refuse to complete an Equipment or Parts order if any term and/or condition governing this agreement is not complied with by Buyer. In the event of cancellation by Seller, or in the event Seller consents to a request by Buyer to stop work or to cancel the whole or any part of any order, Buyer shall make reimbursement to Seller, as follows: (i) any and all work that can be completed within (30) days from date of notification to stop work on account of cancellation shall be completed, shipped and paid in full; and (ii) for work in progress and any materials and supplies procured or for which definite commitments have been made by Seller in connection with the order, Buyer shall pay such sums as may be required to fully compensate Seller for actual costs incurred, plus fifteen percent (15%). Buyer may not cancel any order after Seller's delivery to place of shipment. Orders for "Special" Equipment may not be cancelled after acceptance, except by Seller. Items of "Special" Equipment are those that differ from standard Seller specifications, have a limited market, or incorporate specifications that have been determined for a specific application. Determination of whether an item of Equipment is "Special" shall be made by Seller in its sole discretion.

6. **Inspection and Acceptance of Parts and Equipment.** Buyer agrees that it shall inspect the Parts and or Equipment immediately after receipt and promptly (in no event later than fifteen (15) days after receipt) notify Seller in writing of any non-conformity or defect. Buyer further agrees that failure to give such prompt notice on the commercial use of the Parts and or Equipment shall constitute acceptance. Acceptance shall be final and Buyer waives the right to revoke acceptance for any reason, whether or not known by Buyer at the time of such acceptance. The giving of any such notice by Buyer shall automatically cause the provisions of Seller's warranty to apply and govern the rights, obligations and liabilities of the parties with respect to such nonconformity or defect, provided under no circumstances shall rejection give rise to any liability of Seller for incidental or consequential damages or losses of any kind.

7. **Warranty.** Seller warrants its new Products sold hereunder to be free, under normal use and service, of any defects in manufacture or materials for a period of [INSERT APPLICABLE WARRANTY TERM], whichever occurs first; provided that Buyer sends Seller written notice of the defects within thirty (30) days of its discovery and establishes that: (i) the Parts and or Equipment have been maintained and operated within the limits of rated and normal usage; and (ii) the defect did not result in any manner from the intentional or negligent action or inaction by Buyer, its agents or employees. If requested by Seller, Buyer must return the defective Parts and or Equipment to Seller's manufacturing facility for inspection, and if Buyer cannot establish that conditions (i) and (ii) above have been met, then this warranty shall not cover the alleged defect. Failure to give written notice of defect within such period shall be a waiver of this warranty and any assistance rendered thereafter shall not extend or revive it. Accessories, assemblies and components included in the Products of Seller, which are not manufactured by Seller, are subject to the warranty of their respective manufacturers. This warranty shall not cover any item on which serial numbers have been

altered, defaced or removed. Maintenance and wear parts are not covered by this warranty and are the sole maintenance responsibility of Buyer. This warranty is limited to the first retail purchaser and is not assignable or otherwise transferable without written agreement of the manufacturer. THIS WARRANTY IS EXPRESSLY IN LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED (INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) AND ALL OTHER OBLIGATIONS OR LIABILITY ON SELLER'S PART. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE LIMITED WARRANTY CONTAINED HEREIN. Seller neither assumes nor authorizes any other person to assume for Seller any other liability in connection with the sale of Seller's Products. This warranty shall not apply to any of Seller's Products or any part thereof which has been subject to misuse, alteration, abuse, negligence, accident, acts of God or sabotage. No action by either party shall operate to extend or revive this limited warranty without the prior written consent of Seller.

8. **Remedies for Breach.** IN THE EVENT OF ANY BREACH OF THE WARRANTY BY SELLER, THE PARTIES AGREE THAT SELLER'S LIABILITY SHALL BE LIMITED EXCLUSIVELY TO THE REMEDIES OF REPAIR OR REPLACEMENT (AT SELLER'S SOLE DISCRETION) OF ANY DEFECTIVE PARTS OR EQUIPMENT COVERED BY THE WARRANTY. IN NO EVENT SHALL SELLER, OR ANY SUBSIDIARY OR DIVISION THEREOF BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OR LOSSES RESULTING FROM A BREACH OF WARRANTY INCLUDING, WITHOUT LIMITATION, LABOR COSTS, LOSS OF USE OF OTHER EQUIPMENT, THIRD PARTY REPAIRS, PERSONAL INJURY, EMOTIONAL OR MENTAL DISTRESS, IMPROPER PERFORMANCE OR WORK, PENALTIES OF ANY KIND, LOSS OF SERVICE OF PERSONNEL, OR FAILURE OF EQUIPMENT TO COMPLY WITH ANY FEDERAL, STATE OR LOCAL LAWS.

9. **Limitation of Actions.** Any action for breach of this agreement must be commenced within one (1) year after the cause of action has accrued.

10. **Specification Changes.** In the event Seller incurs additional expense because of changes in specifications or drawings previously approved by Buyer, or in the event Seller is required to modify the ordered Equipment, perform any additional work or supply any additional Parts or equipment, the additional expense shall be added to the purchase price. Seller shall have the right, in its sole discretion, to accept or reject any changes to specifications requested by Buyer. In no event shall any changes in specifications be made or accepted thirty (30) days prior to launch date or thereafter.

11. **Security Interest.** Buyer grants Seller a security interest in the Parts and Equipment purchased and the proceeds thereof. The security interest shall continue until payment in full of the purchase price and payment and performance by Buyer of all of its other obligations hereunder. Seller is entitled to all remedies of a secured party after default under the Delaware Uniform Commercial Code in addition to all other rights provided by contract and by operation of law. Buyer agrees to pay to Seller, in addition to the interest on overdue sums due, reasonable attorney fees, court costs and other expenses of Seller incurred in enforcing Seller's rights. The Parts and Equipment purchased shall remain personal property and shall not become or be deemed a fixture or a part of any real estate on which it may be located. Buyer agrees to execute any instrument or document considered necessary by Seller to perfect its security interest in the Parts and Equipment including, but not limited to, financing statements, chattel mortgages, deeds of trust, deeds to secure debt, mortgages or other security instruments.

12. **Insurance.** Until the purchase price of the Equipment is paid in full, the Buyer shall provide and maintain insurance equal to the total value of the Equipment delivered hereunder against customary casualties and risks; including, but not limited to fire and explosion, and shall also insure against liability for accidents and injuries to the public or to employees, in the names of Seller and Buyer as their interest may appear, and in an amount satisfactory to Seller. If the Buyer fails to provide such insurance, it then becomes the Buyer's responsibility to notify the Seller so that the Seller may provide same; and the cost thereof shall be added to the contract price. All loss resulting from the failure to affect such insurance shall be assumed by the Buyer.

13. **Patents, Copyrights, Trademarks, Confidentiality.** No license or other rights under any patents, copyrights or trademarks owned or controlled by Seller or under which Seller is licensed are granted to Buyer or implied by the sale of Equipment or Parts hereunder. Buyer shall not identify as genuine products of Seller products purchased hereunder which Buyer has treated, modified or altered in any way, nor shall Buyer use Seller's trademarks to identify such products; provided, however, that Buyer may identify such products as utilizing, containing or having been manufactured from genuine products of Seller as treated, modified or altered by Buyer or Buyer's representative, upon written prior approval of Seller. All plans, photographs, designs, drawings, blueprints, manuals, specifications and other documents relating to the business of Seller ("Information") shall be and remain the exclusive property of Seller and shall be treated by Buyer as confidential information and not disclosed, given, loaned, exhibited, sold or transferred to any third party without Seller's prior written approval; provided, however, that these restrictions shall not apply to Information that Buyer can demonstrate: (a) at the time of disclosure, is generally known to the public other than as a result of a breach of this Agreement by Buyer; or (b) is already in Buyer's possession at the time of disclosure by from a third party having a right to impart such Information.

14. **Default and Seller's Remedies.** In the event of default by Buyer, all unpaid sums and installments owed to Seller, shall, at the Seller's sole option, become immediately due and payable without notice of any kind to Buyer. In addition to its right of acceleration, Seller may pursue any and all remedies allowed by law or in equity, including but not limited to any and all remedies available to it under the Delaware Uniform Commercial Code. In addition to the foregoing, and not in limitation thereof, Seller shall have the right to set off any credits or amounts owed to Buyer against any amounts owed by Buyer to Seller.

15. **Indemnification by Buyer.** Buyer hereby agrees to indemnify, release, defend and hold harmless Seller, its directors, officers, employees, agents, representatives, successors, and assigns against any and all suits, actions or proceedings at law or in equity (including the costs, expenses and reasonable attorney's fees incurred in connection with the defense of any such matter) and from any and all claims demands, losses, judgments, damages, costs, expenses or liabilities, to any person whatsoever (including Buyer's and Seller's employees or any third party), or damage to any property (including Buyer's property) arising out of or in any way connected with the performance or the furnishing of services, Parts or Equipment under this agreement, regardless of whether any act, omission, negligence (including any act, omission or negligence, relating to the manufacture, design, repair, erection, service or installation of or warnings made or lack thereof with respect to any Products furnished hereunder) of Seller, its directors, officers, employees, agents, representatives, successors or assigns caused or contributed thereto. If Buyer fails to fulfill any of its obligations under this paragraph or this agreement, Buyer agrees to pay Seller all costs, expenses and attorney's fees incurred by Seller to establish or enforce Seller's rights under this paragraph or this agreement. The provisions of this paragraph are in addition to any other rights or obligations set forth in this agreement.

16. **Installation.** Unless otherwise expressly agreed in writing, Buyer shall be solely responsible for the installation and erection of the Parts and Equipment purchased. Although Seller may in some cases provide a serviceman, data and drawings to aid Buyer with installation or start-up, Seller assumes no responsibility for proper installation or support of the Parts and Equipment when installed and disclaims any express or implied warranties with respect to such installation and support. Notwithstanding, whether data and drawings are provided or a serviceman aids in the installation, Buyer shall indemnify and hold Seller harmless and at Seller's request, defend Seller from all claims, demands or legal proceedings (including the costs, expenses and reasonable attorney's fees incurred in connection with the defense of any such matter) which may be made or brought against Seller in connection with damage or personal injury arising out of said installation or start-up.

17. **Construction and Severability.** These Terms and Conditions of Sale constitute the entire agreement between the parties regarding the subject matter herein and shall be construed and enforced in accordance with the laws of the State of Delaware. Seller shall not be bound by any agent's, employee's or dealer's representation or by any other representation, promise or inducement not set forth herein. The invalidity or unenforceability of any provisions of this agreement shall not affect any other provision and this agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

18. **Jurisdiction.** The parties agree that the proper and exclusive forum and venue in all legal actions brought to enforce or construe any provision of this agreement is the US District Court, District of Delaware, or, if federal jurisdiction is lacking in such legal action, in the State Courts of the State of Delaware located in New Castle County, Delaware.

19. **No Assignment.** No rights arising under this agreement may be assigned by the Buyer unless expressly agreed to in writing by the Seller.

20. **Miscellaneous.** Buyer represents that: (i) it is solvent and has the financial ability to pay for the Equipment and Parts purchased hereunder and (ii) it has all requisite right, power and authority to perform its obligations under this agreement.

## SCHEDULE D

Collateral Description to be affixed to Financing Statement Between

TEREX CONSTRUCTION AMERICAS , division of Terex Corporation ("Secured Party")

and

_____Southern Track and Pump, LLC_____ inc. ___ ("Debtor")

This financing statement covers the following types (or items) of property:

A.   The following property of Debtor, wherever located, whether now owned or hereafter acquired, and all accessories, supplies and parts, including repossessions, returns and additions to, and all cash and non-cash proceeds of any of it:  All of Debtor's inventory, equipment and parts purchased from Secured Party, including any and all related software either embedded or not embedded, and all documents including books and records, and all existing or subsequently arising accounts and accounts receivable and supporting obligations which may from time to time hereafter come into existence.

(Please note that the Secured Party claims a Purchase Money Security Interest in the foregoing property.)

B.   The following property of Debtor, wherever located, whether now owned or hereafter acquired, and all additions and accessions to and all proceeds and products of any of it:  All of Debtor's inventory, equipment and parts purchased from Secured Party including any and all related software either embedded or not embedded, and all accounts, chattel paper and instruments arising out of Debtor's ownership or disposition of said inventory, equipment and parts, and all trade-ins therefore.

**SUPERIOR COURT**  EFiled: Jul 23 2008  3:36PM EDT
**CIVIL CASE INFORMATION STATEMENT (CIS)**  Transaction ID 20767180
Case No. 08C-07-197 JEB

COUNTY:  ☑N  ☐K  ☐S       CIVIL ACTION NUMBER: _____

| | |
|---|---|
| Caption:<br><br>Southern Track and Pump, Inc.,<br><br>_____ Plaintiff,<br><br>v.<br><br>Terex, d/b/a TEREX CONSTRUCTION AMERICAS,<br><br>_____ Defendant. | Civil Case Code: __CDBT_____<br><br>Civil Case Type: __Breach of Contract__<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>Name and Status of Party filing document:<br><br>Southern Tract and Pump, Inc. (Plaintiff)<br><br>Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>Complaint<br><br>JURY DEMAND:  Yes ☐   No ☑ |

| | |
|---|---|
| ATTORNEY NAME(S):<br>Peter J. Walsh, Jr., and Suzanne M. Hill<br><br>ATTORNEY ID(S):<br>#2437, and #4414 respectively<br><br>FIRM NAME:<br>Potter Anderson & Corroon LLP<br><br>ADDRESS:<br>1313 North Market Street, Hercules Bldg, 6th Floor<br><br>Wilmington, DE 19899<br><br>TELEPHONE NUMBER:<br>(302) 984-6000<br><br>FAX NUMBER:<br>(302) 658-1192<br><br>E-MAIL ADDRESS:<br>pwalsh@potteranderson.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>EXPLAIN THE RELATIONSHIP(S):<br><br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

857510                                                                                   Revised 3/2008

# EXHIBIT 2

EFiled: Jul 23 2008 3:36PM EDT
Transaction ID 20767180
Case No. 08C-07-197 JEB

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

Southern Track and Pump, Inc.,            )
                                          )
            Plaintiff,                    )        C.A. No. _____
                                          )
v.                                        )
                                          )
Terex Corporation, d/b/a TEREX            )
CONSTRUCTION AMERICAS,                    )
                                          )
            Defendant.                    )

**SUMMONS**

THE STATE OF DELAWARE,
TO THE SHERIFF OF NEW CASTLE COUNTY:

YOU ARE COMMANDED:

To summon the above named Defendant so that, within 20 days after service hereof upon Defendant, exclusive of the day of service, Defendant shall serve upon Peter J. Walsh, Jr., Esq. , Plaintiff's attorney, whose address is 1313 N. Market Street, P.O. Box 951, Wilmington, DE 19899, an answer to the complaint (and, if the complaint contains a specific notation requiring the defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon Defendant a copy hereof and of the complaint.

Sharon Agnew
Prothonotary

Dated: 7/30/08

Per Deputy

TO THE ABOVE NAMED DEFENDANT:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an answer to the complaint (and, if the complaint contains a specific notation requiring the defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the complaint.

Sharon Agnew
Prothonotary

Dated:

Per Deputy

# EXHIBIT 3



CORPORATION SERVICE COMPANY

## Notice of Service of Process

TVW / ALL
**Transmittal Number: 5955955**
Date Processed: 08/07/2008

| Primary Contact: | Ms. Sandra Rodriguez<br>Terex Corporation<br>200 Nyala Farm Road<br>Westport, CT 06880 |
|---|---|

| Entity: | Terex Corporation<br>Entity ID Number 1950584 |
|---|---|
| Entity Served: | Terex Corporation, d/b/a Terex Construction Americas |
| Title of Action: | Southern Track and Pump, Inc. vs. Terex Corporation, d/b/a Terex Construction Americas |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court: | New Castle County Delaware, Superior Court, Delaware |
| Case Number: | 08C-07-197 JEB |
| Jurisdiction Served: | Delaware |
| Date Served on CSC: | 08/06/2008 |
| Answer or Appearance Due: | 20 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Plaintiff's Attorney: | Peter J. Walsh, Jr.<br>302-984-6000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

# EXHIBIT 4



**Hiltgen & Brewer, P.C.**
One Benham Place, Suite 800
9400 North Broadway Extension
Oklahoma City, OK 73114-7401

Telephone 405.605.9000
Facsimile 405.605.9010
www.hiltgenbrewer.com

August 14, 2008

**VIA E-MAIL**

Suzanne Hill, Esq.
Peter Walsh, Esq.
Potter, Anderson & Corroon, LLP
1313 North Market Street
Hercules Building, 6th Floor
Wilmington, DE 19899

> Re:  Southern Track & Pump, Inc. v. Terex Corporation, d/b/a Terex
> Construction Americas, Case No. 08C-07-197 JEB, in the Superior Court
> of Delaware In and For New Castle County
> Our File No.: 131.269

Dear Ms. Hill:

This will confirm our telephone conversation of August 13, 2008, regarding the above-captioned matter. As I indicated to you I have been retained to represent Terex Corporation in this matter. I also inquired of you whether your client is seeking an excess of $75,000.00 exclusive of interest, costs and attorney fees. You indicated to me that your client was seeking in excess of $75,000.00, and I advised you that in all likelihood we would be removing this matter to Federal Court.

Thank you for your timeliness in returning my call. If you have any questions, please do not hesitate to contact me.

Very truly yours,

*Dictated but not read*

Cary E. Hiltgen

CEH/kmb

# EXHIBIT 5

Womble Carlyle Sandridge & Rice PLLC-Wilmington | Resource Center | File & Serve Preferences

| **Home** | **Filing & Service** | **Alerts** | **Search** |

| Case History | Cases Search | Daily Docket | Transaction Status | Advanced Search | Service of Process Transactions |

Case History Search > Select Case > **Results**

## Case History Search
Search Created:
Monday, August 25, 2008 11:31:48 EDT

Printable Version

You have been billed $10.00 for this search.

| **Court:** | DE Superior Court-New Castle County | **Judge:** | Babiarz, John E | **File & Serve Live Date:** | 7/23/2008 |
| **Division:** | | **Case Number:** | 08C-07-197 JEB | **Document(s) Filed:** | 6 |
| **Case Type:** | CDBT - Debt/Breach of Contract | **Case Name:** | Southern Track & Pump Inc vs Terex Corp et al | **Date Range:** | All |

Choose an action: -- Select --    [Go]    Show 50    records

1-2 of 2 transactions    <<Prev Page 1 of 1 Next>>

| Transaction | ▼Date/Time | Option | Case Number / Case Name | Authorizer / Organization | # | Document Type | Document Title | Size |
|---|---|---|---|---|---|---|---|---|
| 20847592 | 7/30/2008 5:00 PM EDT | File Only | 08C-07-197 JEB Southern Track & Pump Inc vs Terex Corp et al | John E Babiarz, DE Superior Court-New Castle County | 6 | Writ(s) Issued | (1) writ issued - New Castle | 0MB |
| 20767180 | 7/23/2008 3:36 PM EDT | File Only | 08C-07-197 JEB Southern Track & Pump Inc vs Terex Corp et al | Peter J Walsh, Potter Anderson & Corroon LLP-Wilmington | 1 | Complaint | Complaint filed on behalf of Plaintiff Southern Track and Pump, Inc. [view] | 0.2MB |
| | | | | | 2 | Exhibits | Exhibit A to Complaint filed on behalf of Plaintiff Southern Track and Pump, Inc. [view] | 0.7MB |
| | | | | | 3 | Case Information Statement | Case Information Sheet (to Complaint filed on behalf of Plaintiff Southern Track and Pump, Inc.) [view] | 0.1MB |
| | | | | | 4 | Praecipe | Praecipe (to Complaint filed on behalf of Plaintiff Southern Track and Pump, Inc.) [view] | 0.1MB |
| | | | | | 5 | Summons | Summons (to Complaint filed on behalf of Plaintiff Southern Track and Pump, Inc.) [view] | 0.1MB |

1-2 of 2 transactions    <<Prev Page 1 of 1 Next>>

 **LexisNexis®**

About LexisNexis | Terms & Conditions | Privacy | Customer Support - 1-888-529-7587
Copyright © 2008 LexisNexis®. All rights reserved.

2JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Southern Track & Pump, Inc., a Florida Corporation

**DEFENDANTS**

Terex Corporation, d/b/a Terex Construction Americas

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE
LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

AnnaMartina Tyreus
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Tel: 302-252-4320

Attorneys (If Known)

**I. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 862 Black Lung (923) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID title XVI | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **PRISONER PETITIONS** | | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities-Employment | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities-Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

(PRISONER PETITIONS) ☐ 510 Motions to Vacate Sentence **Habeas Corpus:** ☐ 530 General ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition

**V. ORIGIN** (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. §§ 1332, 1441 and 1446

Brief description of cause: Contract dispute

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   August 26, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

WCSR 3966080v1