# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOUTHERN TRACK AND PUMP, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 08-543-LPS |
| | : |
| TEREX CORP., d/b/a TEREX | : |
| CONSTRUCTION AMERICAS, | : |
| | : |
| Defendant. | : |

Peter J. Walsh, Jr., Esquire and Suzanne Hill Holly, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, DE.

　　Attorneys for Plaintiff.

Cary E. Hiltgen, Esquire and Jeff C. Grotta, Esquire of HILTGEN & BREWER, P.C., Oklahoma City, OK.
James M. Lennon, Esquire and Ryan C. Cicoski, Esquire of WOMBLE CARLYLE SANDRIDGE & RICE PLLC, Wilmington, DE.

　　Attorneys for Defendant.

## **MEMORANDUM OPINION**

March 28, 2012
Wilmington, Delaware.

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Currently pending before the Court are the following motions filed by Plaintiff Southern

Track and Pump, Inc. ("STP") and Defendant Terex Corporation ("Terex"):

- Defendant's Motion for Partial Summary Judgment on Counts I and II of the Second Amended Complaint (D.I. 189)

- Defendant's Motion for Partial Summary Judgment on Count III of the Second Amended Complaint (D.I. 191)

- Defendant's Motion for Partial Summary Judgment on Counterclaim I of the Second Amended Counterclaims (D.I. 195)

- Defendant's Motion for Partial Summary Judgment on Counterclaim II of the Second Amended Counterclaims (D.I. 197)

- Defendant's Motion for Partial Summary Judgment on Counterclaim III of the Second Amended Counterclaims (D.I. 199)

- Defendant's Motion in Limine to Strike Expert Opinions of Charles J. Cummiskey (D.I. 201)

- Plaintiff's Motion for Partial Summary Judgment on Counts I and II of the Second Amended Complaint and Counterclaim III of the Second Amended Counterclaims (D.I. 204)

The Court held a hearing on December 21, 2011. (D.I. 265) (hereinafter "Tr.") For the

reasons set forth below, the Court will grant Plaintiff's motion for partial summary judgment

with respect to Counts I and II of the Second Amended Complaint and Counterclaim III of the

Second Amended Counterclaims. The Court will grant Defendant's motions for partial summary

judgment with respect to Count III of the Second Amended Complaint and Counterclaims I and

II of the Second Amended Counterclaims. The Court will deny Defendant's motion in limine to

exclude expert testimony, as well as Defendant's remaining motions for partial summary

judgment.

1

## II.    BACKGROUND

### A.    The Parties and the Relevant Agreements

STP is a Florida-based equipment dealership that sells, rents, and services construction equipment and parts. Terex is a Delaware corporation and manufacturer of equipment used in construction and other infrastructure-related activities. In 2006, STP and Terex began discussing a potential business relationship through which STP would become a distributor of Terex construction equipment. (D.I. 190 at 1) Those negotiations resulted in three contracts that now form the basis for the present litigation; those contracts and their relevant provisions are summarized below.

### 1.    The Distributorship Agreement Between STP and Terex

In April 2007, STP and Terex entered into a Distributorship Agreement. (*Id.* at 3) The Distributorship Agreement sets forth the various terms and conditions under which STP was to act as a Terex distributor in Florida. Two provisions of the Distributorship Agreement, Section 3.1(a) and Section 3.1(e), are of particular relevance to this case.

Section 3.1(a) of the Distributorship Agreement required STP to "promote the sale, lease, and use" of Terex equipment and to purchase such products "in at least the amount listed as the Minimum Purchases Amount in **Schedule A**." (D.I. 206, Ex. C) Schedule A, in turn, provided for the quarterly purchase of specified quantities of Terex construction equipment and parts, including excavators, wheel loaders, dump trucks, and backhoes. (*Id.*)

Section 3.1(e) of the Distributorship Agreement required STP to "[m]aintain an inventory of [Terex] Products reasonably sufficient to meet the anticipated short-term demand" for those products. (*Id.*)

2

## 2. The Inventory Financing Agreement Between STP and GE

Because Terex did not have its own "captive financing arm" to finance STP's purchase of inventory from Terex, it introduced STP to GE Commercial Distribution Finance Corporation ("GE"), an entity with whom Terex had contracted to provide financing for Terex distributors. (D.I. 225 at 4) Subsequently, in March 2007, STP and GE entered into an Inventory Financing Agreement, which set forth the terms under which GE would provide financing to STP, as well as the rights and remedies available to GE in the event of default by STP. (D.I. 206, Ex. D)

## 3. The Recourse Agreement Between Terex and GE

The third and final contract is the Recourse Agreement, entered into between Terex and GE in March 2007. GE required Terex to enter the Recourse Agreement as a condition to providing financing to STP. (D.I. 225 at 8) Under the terms of the Recourse Agreement, Terex was required to pay GE in the event that STP defaulted and GE repossessed inventory from STP. (D.I. 205 at 7; D.I. 208, Ex. 17)

## B. Events Leading to the Present Litigation

Pursuant to the contracts described above, STP purchased approximately $4 million of equipment and approximately $50,000 of parts from Terex. (D.I. 205 at 8) STP soon encountered commercial difficulties as a Terex distributor, triggering a sequence of events that resulted in the eventual deterioration and termination of STP's business relationships and associated contracts with Terex and GE.

By letter dated May 6, 2008, GE terminated the Inventory Financing Agreement, citing STP's default under the terms of that agreement. (D.I. 206, Ex. K) Shortly thereafter, on May 20, 2008, STP sent a letter to Terex terminating the Distributorship Agreement, and notifying Terex of its intent to return all remaining inventory. (*Id.*, Ex. L) Terex accepted STP's

3

termination, but denied any obligation to repurchase inventory from STP. (*Id.*, Ex. M)

In July 2008, GE began repossessing inventory that had been financed pursuant to its Inventory Financing Agreement with STP. (D.I. 205 at 11) GE later sold several pieces of the repossessed equipment to other dealers, sold eight pieces of equipment to Terex, and sold the remaining pieces of equipment at auction. (*Id.* at 11-12) GE then demanded a deficiency of over $1.7 million from STP and initiated arbitration proceedings against STP; STP and GE eventually settled their dispute after STP agreed to pay $1 million to GE. (*Id.* at 12)

Because STP defaulted and GE repossessed STP's financed inventory, Terex was required to pay recourse to GE in the amount of $434,675 pursuant to the Recourse Agreement between GE and Terex.

## C. The Parties' Pleadings and Motions

On July 23, 2008, STP filed suit against Terex in the Superior Court of the State of Delaware. Terex subsequently removed the case to this Court.[1] On June 29, 2009, STP filed its Second Amended Complaint against Terex. (D.I. 49) Count I seeks a declaration that the Delaware Dealer Statute, 6 Del. C. §§ 2720 *et seq.* ("Dealer Statute"), applies to the parties' Distributorship Agreement. Count II seeks a declaration that Terex violated the Dealer Statute by refusing to repurchase inventory following STP's termination of the Distributorship Agreement. Count III alleges that Terex's refusal to repurchase inventory was a breach of the implied covenant of good faith and fair dealing.

On August 3, 2010, Terex filed its Second Amended Answer and Counterclaims. (D.I.

---

[1]STP subsequently amended its complaint to include claims for fraud and negligent misrepresentation, but the parties have since stipulated to the dismissal of those counts. (D.I. 188) On June 9, 2009, the Court partially dismissed STP's good faith and fair dealing claim. (D.I. 44; D.I. 45)

4

151) Counterclaim I asserts a breach of contract claim against STP for failure to pay on open accounts in connection with the Distributorship Agreement. Counterclaim II seeks the recovery of sales proceeds in connection with an item of Terex equipment sold by STP under the Distributorship Agreement. Counterclaim III seeks reimbursement for the $434,675 recourse payment made by Terex to GE pursuant to the Recourse Agreement.

On June 30, 2011, the parties filed various motions for partial summary judgment in connection with Counts I, II, and III of the Second Amended Complaint and Counterclaims I, II, and III of the Second Amended Counterclaims. Specifically, both parties filed cross-motions for partial summary judgment in connection with Counts I and II of the Second Amended Complaint and Counterclaim III of the Second Amended Counterclaims. (D.I. 204; D.I. 189; D.I. 199) Terex also filed motions for partial summary judgment with respect to the remaining claims: Count III of the Second Amended Complaint and Counterclaims I and II of the Second Amended Counterclaims. (D.I. 191; D.I. 195; D.I. 197) Finally, Terex filed a motion in limine to strike the expert opinions of STP's damages expert, Charles J. Cummiskey. (D.I. 201)[2]

## III. LEGAL STANDARDS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine

---

[2]Terex also filed a motion for partial summary judgment in connection with STP's damage claims for alleged start-up costs and unpaid warranty claims. (D.I. 193) In response, STP indicated that it was "no longer seeking damages based on start-up costs or unpaid warranty claims." (D.I. 228) In view of STP's representation, the Court will deny Terex's motion as moot.

issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

6

granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the non-moving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## B.     Admissibility of Expert Opinion Testimony

Motions to exclude evidence are committed to the Court's discretion. *See In re Paoli*, 35 F.3d 717, 749 (3d Cir. 1994). The admissibility of expert testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Pursuant to Rule 702, in order to be admissible, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." The Supreme Court has assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Thus, expert testimony shall be admitted at trial only if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The Third Circuit has described these requirements as "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

Rule 702 embodies a "liberal policy of admissibility." *See Pineda v. Ford Motor Co.*,

7

520 F.3d 237, 243 (3d Cir. 2008) (internal citations omitted). Nonetheless, the burden is placed

on the party offering expert testimony to show that it meets all of the standards for admissibility.

*See Daubert*, 509 U.S. at 592 n.10; *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999). Once that

burden is met, a Court must consider additional factors before precluding expert testimony:

> (1) the prejudice or surprise of the party against whom the excluded
> evidence would have been admitted; (2) the ability of the party to
> cure that prejudice; (3) the extent to which allowing the evidence
> would disrupt the orderly and efficient trial of the case or other cases
> in the court; and (4) bad faith or willfulness in failing to comply with
> a court order or discovery obligation.

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (internal quotation marks

omitted). The exclusion of important evidence is an "extreme sanction, not normally to be

imposed absent a showing of willful deception or flagrant disregard of a court order by the

proponent of the evidence." *In re Paoli*, 35 F.3d at 791–92 (internal quotation marks omitted).

## IV. DISCUSSION

### A. Count I of the Second Amended Complaint: Applicability of the Delaware Dealer Statute

Count I of the Second Amended Complaint seeks a declaration that the Delaware Dealer

Statute, 6 Del. C. §§ 2720 *et seq.*, applies to the Distributorship Agreement, thereby obligating

Terex to repurchase inventory from STP following the termination of the Distributorship

Agreement.

Section 2722(a) of the Dealer Statute sets forth the repurchase requirement, and provides

in relevant part that "[w]henever a ***contract agreement*** between a dealer and a supplier is

terminated by either party, the supplier shall repurchase the dealer's inventory . . . unless the

dealer chooses to keep the inventory." 6 Del. C. § 2722(a) (emphasis added). Section 2720(2)

of the Dealer Statute, in turn, defines a "contract agreement" to mean "a written or oral contract

8

or agreement between a dealer and a supplier by which . . . the dealer is required to ***order and maintain*** an inventory in excess of $25,000 at current net price from the supplier." *Id.* § 2720 (emphasis added).[3]  Both parties agree that the Dealer Statute's repurchase requirement applies only to contract agreements that require a dealer to "order ***and*** maintain" in excess of $25,000 of inventory from a supplier. (D.I. 225 at 21)  However, the parties disagree as to whether the Distributorship Agreement is properly considered a "contract agreement" that is subject to the repurchase requirements of the Dealer Statute.

STP contends that the Distributorship Agreement is a "contract agreement" within the meaning of the Dealer Statute because it unambiguously required STP to "order and maintain" at least $25,000 of inventory from Terex.  According to STP, Section 3.1(a) of the Distributorship Agreement required STP to "order" Terex equipment "in at least the amount listed as the Minimum Purchases Amount in Schedule A."  Schedule A, in turn, provides for the quarterly purchases of various items of Terex equipment whose total aggregate value far exceeds the $25,000 minimum amount required by the Dealer Statute.  Similarly, STP argues that Section 3.1(e) of the Distributorship Agreement required STP to "maintain" an inventory of Terex products "reasonably sufficient to meet the anticipated short-term demand," which according to STP also would vastly exceed $25,000 in value, given the high price of each individual piece of Terex equipment identified in Schedule A.[4]

---

[3]Consistent with Sections 2722(a) and 2720(2), Section 2722(c) states that the repurchase requirement of Section 2722(a) "does not apply to a supplier that does not require the dealer to order and maintain an inventory in excess of $25,000 at current net price from the supplier."

[4]For example, according to STP, a single Terex Loader Backhoe was priced at $42,675.50, and other equipment was priced at up to $218,645 apiece. (D.I. 205 at 15)  Terex does not dispute that purchasing the equipment listed on Schedule A would cost STP in excess of $25,000. (*See* Tr. at 30-31, 35)

9

Terex responds that the Dealer Statute does not apply because the Distributorship

Agreement did not require STP to "order and maintain" $25,000 worth of Terex equipment.

According to Terex, the Distributorship Agreement is not a "contract agreement" subject to the

Dealer Statute because "the words 'order and maintain an inventory in excess of $25,000' appear

nowhere" in it. (D.I. 225 at 22)  Terex argues that Section 3.1(a) merely required STP to order

inventory in accordance with Schedule A, without expressly mentioning the purchase of more

than $25,000 of inventory, or any other particular dollar amount. (*Id.*)  Terex likewise argues

that Section 3.1(e) does not meet the statutory $25,000 amount because it neither references

Schedule A, nor recites any particular dollar amount in excess of the $25,000 statutory

minimum. (*Id.* at 23-24)  Terex further contends that other provisions of the Distributorship

Agreement, such as Sections 4.2, 4.3, and 10.1, "provided flexibility" rather than imposing any

fixed purchase or maintenance obligations on STP.  (*Id.* at 23)[5]  Thus, in the view of Terex, the

Distributorship Agreement, when properly read as a whole, "did not create rigid, mechanical

requirements" for inventory purchases and maintenance, but rather "reflect[ed] the parties' intent

to have flexibility." (*Id.* at 24)  Finally, Terex argues, to the extent the relevant provisions of the

Distributorship Agreement are ambiguous, the extrinsic evidence, including the parties' course

of conduct, also "establishes the parties did not intend to require STP to make minimum

purchases or maintain any minimum amount of inventory." (*Id.* at 25)

The parties' cross-motions for summary judgment are based on competing interpretations

---

[5]Specifically, Terex argues that Section 4.3 provides for flexibility by contemplating seven
different scenarios in which Terex could refuse to accept any order or to ship products to STP.
Terex similarly argues that Sections 4.2 and 10.1 provided flexibility because Terex could refuse
to make further shipments without advance payment by STP, and either party could cancel
shipments. (D.I. 225 at 23)

of the Distributorship Agreement, which is governed by Delaware law. (D.I. 206, Ex. C ¶ 10.2)
Under Delaware law, "[w]hen the issue before the Court involves the interpretation of a contract,
summary judgment is appropriate only if the contract in question is unambiguous." *United
Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). "A contract is not
rendered ambiguous simply because the parties do not agree upon its proper construction."
*Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.
1992). Rather, an ambiguity exists only when a contract is fairly susceptible to two or more
reasonable interpretations. *See GMG Capital Investments, LLC v. Athenian Venture Partners I,
L.P.*, 36 A.3d 776, 780 (Del. 2012); *Rhone-Poulenc*, 616 A.2d at 1196.

The Court concludes that STP is entitled to summary judgment because the
Distributorship Agreement unambiguously required STP to "order and maintain" at least
\$25,000 of inventory from Terex, and therefore qualifies as a "contract agreement" within the
meaning of the Dealer Statute. Section 3.1(a) of the Distributorship Agreement unambiguously
required STP to "order" inventory from Terex in accordance with Schedule A, and it is
undisputed that the minimum purchases in Schedule A would far exceed the statutory minimum
of \$25,000, as acknowledged by counsel for Terex during the hearing. (Tr. at 30-31, 35)
Similarly, Section 3.1(e) unambiguously required STP to "maintain" inventory levels that were
"reasonably sufficient to meet the anticipated short-term demand." In the Court's view, the only
reasonable interpretation of Section 3.1(e) is that STP was required to maintain at least *some*,
non-zero quantity of inventory from Schedule A. Because Terex concedes that even a single
piece of equipment from Schedule A would cost more than \$25,000 (*see* Tr. at 31, 35), it follows
that Section 3.1(e) required STP to "maintain" inventory in excess of \$25,000. The
Distributorship Agreement therefore meets the statutory definition of a "contract agreement"

11

under the Dealer Statute.

The Court is unpersuaded by Terex's contention that the Distributorship Agreement unambiguously established a flexible relationship without imposing any minimum requirements. As STP points out, any flexibility applied solely to Terex in its role as the *supplier*, but the relevant inquiry under the Dealer Statute concerns the requirements imposed by the "contract agreement" on the *dealer*.[6]

Accordingly, the Court will grant STP's motion for partial summary judgment with respect to Count I of the Second Amended Complaint.

## B.    Count II of the Second Amended Complaint: Violation of the Delaware Dealer Statute

Count II of the Second Amended Complaint alleges that Terex violated the Dealer Statute by refusing to repurchase STP's remaining inventory following termination of the Distributorship Agreement. Section 2723(a) of the Dealer Statute provides that a "supplier shall repurchase from the dealer within 90 days after termination of the contract agreement *all* inventory previously purchased from the supplier that remains unsold on the date of the termination of the agreement." 6 Del. C. § 2723(a) (emphasis added). It is undisputed that Terex did not repurchase STP's remaining inventory within 90 days of STP's termination of the Distributorship Agreement. On that basis STP seeks summary judgment that Terex violated the repurchase requirement of Section 2723(a) of the Dealer Statute.

Terex cross-moves for summary judgment that it did not violate the Dealer Statute because, in its view, Sections 2723(b) and 2723(c) of the Dealer Statute limit the repurchase

---

[6]Because the Court concludes that the Distributorship Agreement unambiguously required STP both to "order and maintain" inventory in excess of $25,000, it is unnecessary to address the extrinsic evidence relied on by Terex.

12

requirement of Section 2723(a) to only new, unused, and undamaged inventory, or inventory that

Terex has otherwise certified as acceptable. (D.I. 225 at 28) According to Terex, Section

2723(b) imposes a mandatory pricing formula for the repurchase of new, unused, and

undamaged inventory, while Section 2723(c) permits a supplier to inspect used inventory to

certify its acceptability before it is repurchased.[7] (*Id.*) Taken together, Terex argues, Section

2723(b) and Section 2723(c) effectively limit Terex's repurchase obligation to include only

"new or acceptable used inventory," since "Section 2723(c) clearly indicates that some inventory

may not be acceptable following inspection, and thus not subject to being returned." (*Id.* at 28-

29)

STP responds that the only exceptions to a supplier's repurchase obligations are set forth

in Section 2724 of the Dealer Statute, which is entitled "Exceptions to repurchase requirements,"

and which specifically enumerates six limited scenarios in which the repurchase requirement

does not apply.[8] (D.I. 205 at 17)

---

[7]Specifically, Section 2723(b) provides in relevant part that the supplier shall pay the dealer "one
hundred percent of the net cost of all new, unused, undamaged, and complete inventory" and
"eighty-five percent of the current net price of all new, unused and undamaged repair parts."
Section 2723(c) provides that "inventory shall be returned FOB to the dealership" and that "[t]he
dealer and the supplier may each furnish a representative to inspect all inventory and certify
acceptability before being returned."

[8]Specifically, the six enumerated exceptions contained in 6 Del. C. § 2724 are as follows:

 (1) A repair part with a limited storage life or otherwise subject to deterioration, such as
gaskets or batteries.

 (2) Multiple packaged repair parts when the package has been broken.

 (3) A repair part that, because of its condition, is not resalable as a new part without
repackaging or reconditioning.

 (4) Any inventory that the dealer chooses to keep.

 (5) Any inventory that was acquired by the dealer from a source other than the supplier.

 (6) Any tractors, implements, attachments, or equipment that the dealer purchased from
the supplier more than 36 months before date of the notice of termination.

13

The Court agrees with STP's reading of the Dealer Statute and, accordingly, concludes that Terex's refusal to repurchase inventory was in violation of the Dealer Statute's repurchase requirement. By its plain terms, Section 2723(a) requires suppliers to repurchase "all" remaining unsold inventory from the dealer within 90 days of termination of the contract agreement. Section 2724 specifies the only exceptions to this repurchase requirement.

Contrary to Terex's assertion, Sections 2723(b) and (c) do not establish an additional exception to the repurchase requirement. As Terex itself notes, Section 2723(b) provides a mandatory *pricing* formula for new, unused, and undamaged equipment; inventory that is not new, unused, or undamaged remains subject to the repurchase requirement, but at a price subject to negotiation by the parties instead of the prices set forth by statute. (D.I. 225 at 28) Section 2723(c), in turn, describes the *procedure* for returning inventory to the supplier; specifically, it provides that the inventory must be returned FOB to the dealer, i.e., at the dealer's expense, and upon arrival, both parties may send representatives to inspect and certify the acceptability of the inventory before completing the return.

The provisions for inspection and certification do not, however, permit a supplier to avoid its repurchase obligations by unilaterally rejecting inventory as unacceptable, as Terex appears to argue. In the Court's view, inspection and certification simply provide a mechanism for the parties to confirm whether the returned inventory is in fact new, unused, and undamaged (and therefore subject to the mandatory pricing provided by statute), or whether it is instead used and/or damaged (and therefore subject to a price to be negotiated by the parties). Alternatively, a supplier may wish to inspect inventory to determine whether it is subject to any of the exceptions to the repurchase requirement enumerated in Section 2724(d).

A supplier may not, however, invoke the inspection and certification language of Section

14

2723(c) to refuse returned inventory for reasons unrelated to Section 2723(b) and Section 2723(d), as Terex suggests. Terex's broad reading of Section 2723(c) would allow suppliers unilaterally to reject inventory for unspecified reasons, thereby permitting them to avoid their repurchase obligations under Section 2723(a), and rendering meaningless the specific exceptions to the repurchase requirement set forth in Section 2724.

Here, it is undisputed that Terex failed to repurchase all of STP's remaining inventory following termination of the Distributorship Agreement; nor did Terex contend at that time that any of the exceptions set forth in Section 2724 applied. Moreover, to the extent Terex offered to repurchase some (but not all) of STP's remaining inventory, Terex failed to comply with the mandatory pricing formula with respect to seven pieces of new equipment, as was required by Section 2723(b). (D.I. 225 at 15; D.I. 251 at 13) Based on these undisputed facts, the Court concludes that Terex violated the repurchase requirements of the Dealer Statute. Accordingly, the Court will grant STP's motion for partial summary judgment with respect to Count II of the Second Amended Complaint.[9]

## C. Count III of STP's Second Amended Complaint: Breach of Implied Covenant of Good Faith and Fair Dealing

Count III of the Second Amended Complaint alleges breach of the implied covenant of good faith and fair dealing, based on Terex's failure to repurchase inventory following the termination of the Distributorship Agreement. Under Delaware law, "an implied duty of good faith and fair dealing is interwoven into every contract," to "ensure that the parties' reasonable expectations are fulfilled." *Anderson v. Wachovia Mortgage Corp.*, 497 F. Supp. 2d 572, 581

---

[9]The Court does not, at this time, address the amount of damages suffered by STP as a result of Terex's violation of the Dealer Statute, as the parties agree that further proceedings are required to resolve that issue. (D.I. 205 at 2 n.1; Tr. at 44-45)

(D. Del. 2007). However, Courts generally will imply a duty "[o]nly when it is clear from the writing that the contracting parties would have agreed" to such terms "had they thought to negotiate with respect to that matter." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006). Thus, the Court "must focus on what the parties likely would have done if they had considered the issues involved." *QVT Fund LP v. Eurohypo Capital Funding LLC I*, 2011 WL 2672092, at \*13 (Del. Ch. July 8, 2011).

Here, it is undisputed that the Distributorship Agreement does not expressly impose a repurchase obligation on Terex. STP argues that a repurchase requirement should be implied because both parties would have agreed to such an obligation had the parties considered the issue. (D.I. 230 at 7, 10-11) Specifically, STP argues that Terex would have agreed to a repurchase requirement, due to the various commercial benefits from doing so. (*Id.* at 4-6, 10-11)

The Court is unpersuaded that Terex would have agreed to a repurchase obligation. At most, the evidence cited by STP indicates that Terex might have agreed to the *optional* repurchase of *some* inventory from STP under certain circumstances; however, STP has not identified sufficient evidence from which a reasonable factfinder could conclude that Terex would have agreed to a mandatory *obligation* to repurchase *all* inventory from STP, which is the basis for Count III of the Second Amended Complaint. (*See* D.I. 230 at 4-6) (citing evidence suggesting that Terex might repurchase equipment "if" there was a fear that equipment would end up at auction, and that Terex "may choose to [re]purchase inventory," but ultimately "it was totally up to Terex" whether to do so) Accordingly, the Court will grant Terex's motion for

16

partial summary judgment with respect to Count III of the Second Amended Complaint.[10]

## D. Counterclaims I and II of Terex's Second Amended Counterclaims: Amounts Owed by STP Under the Distributorship Agreement

Counterclaim I of Terex's Second Amended Counterclaims seeks to recover $17,825.85 from STP in connection with STP's outstanding balance under the Distributorship Agreement. Counterclaim II of Terex's Second Amended Counterclaims seeks to recover $43,000.00 from STP in connection with STP's sale of a piece of Telehandler equipment owned by Terex. STP does not dispute its liability with respect to these Counts, but suggests that those amounts should be withheld as a "set-off" against any damages recovered in connection with STP's claims against Terex under the Dealer Statute. (Tr. at 59-60) Because STP does not dispute liability under Counterclaims I and II of the Second Amended Counterclaims, and provides no persuasive basis for the Court to deny summary judgment, the Court will grant summary judgment in Terex's favor with respect to these Counterclaims.

## E. Counterclaim III of Terex's Second Amended Counterclaims: Reimbursement for Recourse Payments

Counterclaim III of Terex's Second Amended Counterclaims seeks to recover from STP the $434,675 paid by Terex under the terms of the Recourse Agreement between Terex and GE. Terex contends it is entitled to equitable subrogation for the full amount of that recourse payment because Terex paid it on behalf of STP.

---

[10]During the hearing, counsel for STP also indicated that if the Court were to grant summary judgment in favor of STP with respect to both Counts I and II of the Second Amended Complaint, then it would not be necessary for STP to pursue Count III of the Second Amended Complaint, since all three Counts relate to Terex's failure to repurchase inventory from STP. (Tr. at 8, 61, 63-64) Those representations provide an additional justification for granting summary judgment in favor of Terex with respect to Count III of the Second Amended Complaint.

Equitable subrogation provides for reimbursement to a person or party "who met the obligation of another or paid the money or the compensation owed by another." *Baio v. Commercial Union Ins. Co.*, 410 A.2d 502, 506 (Del. 1979). It "is an equitable remedy and one who seeks it must, in turn, do equity." *Id.* Here, the Court concludes that Terex is not entitled to the equitable remedy of subrogation because it has failed to do equity itself, as a result of its violation of the repurchase requirements under the Dealer Statute.

Alternatively, Terex contends that if it is not entitled to equitable subrogation, it is nonetheless entitled to indemnification from STP for the full amount of the recourse payment. The Court does not agree. Instead, as a preliminary matter, the Court agrees with STP that Counterclaim III of Terex's Second Amended Counterclaims does not adequately plead a claim for contractual indemnification. Indeed, during the hearing, counsel for Terex acknowledged that contractual indemnification was not pled in the counterclaims, and was instead only raised in interrogatory responses. (Tr. at 42) In any event, Terex's request for indemnification relies on language from the Distributorship Agreement between STP and Terex, and that indemnification provision clearly and repeatedly limits the scope of indemnification to "this agreement," i.e., the Distributorship Agreement. (D.I. 206, Ex. C at TER 0695) It is undisputed that Terex's $434,675 recourse payment was not made pursuant to the Distributorship Agreement with STP but, rather, was made as part of Terex's Recourse Agreement with GE, a separate contract to which STP was not a party.

Accordingly, the Court will grant summary judgment in favor of STP with respect to Counterclaim III of the Second Amended Counterclaims.

**F.      Terex's Motion in Limine to Strike the
Expert Opinion Testimony of Charles J. Cummiskey**

Finally, Terex seeks to exclude the expert testimony of STP's damages expert, Mr.

Charles J. Cummiskey.  According to Terex, Mr. Cummiskey's opinion testimony is unreliable

because he "formulated his expert opinion by performing the analysis STP told him to perform,

and using the information STP told him to use." (D.I. 202 at 9)  Moreover, according to Terex,

STP's attorneys refused to permit Mr. Cummiskey to testify regarding the basis for his expert

opinions.  (*Id.*)

The Court agrees with STP that, under the circumstances presented here, there was

nothing impermissible in Mr. Cummiskey performing his analysis based on assumptions

provided by counsel regarding the proper interpretation of the Dealer Statute.  Terex's

disagreement with STP's underlying legal position does not provide a sufficient basis for

excluding expert opinions based on those positions.

To the extent Terex complains it was denied discovery into the basis for Mr.

Cummiskey's opinions, the Court agrees with STP that Mr. Cummiskey's expert report and

deposition testimony adequately disclose the bases for his opinions, and that any alleged

shortcomings or deficiencies in his opinions are issues of weight and credibility appropriately

addressed through cross-examination and the presentation of contrary evidence, rather than the

outright exclusion of Mr. Cummiskey's testimony.

**V.      CONCLUSION**

For the foregoing reasons, the Court will grant STP's motion for partial summary

judgment with respect to Counts I and II of the Second Amended Complaint and Counterclaim

III of the Second Amended Counterclaims.  The Court will grant Terex's motion for partial

summary judgment with respect to Count III of the Second Amended Complaint and

Counterclaims I and II of the Second Amended Counterclaims. All other motions will be

denied. An appropriate order follows.